George S. EDWARDS, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

May 17, 1976.

Rehearing Denied July 19, 1976.

Lucius E. Burch, Jr., Charles F. Newman, Burch, Porter & Johnson, Memphis, for petitioner.

Robert H. Roberts, Advocate Gen., R. A. Ashley, Jr., Atty. Gen. and Reporter, Nashville, for respondent.

## OPINION

COOPER, Chief Justice.

Petitioner, George S. Edwards, was indicted for murder in the first degree for the June 7, 1972, killing of his sister, Elizabeth (Betty) A. Edwards. Petitioner admitted he had shot and killed his sister on the date alleged in the indictment, and interposed the defense of insanity at the time of commission of the act. The jury found petitioner guilty of murder in the second degree and fixed his punishment at ten years in the penitentiary, and sentence was pro-nounced accordingly. On appeal to the Court of Criminal Appeals, the majority of the court found petitioner's thirty-six assignments of error to be without merit and affirmed the conviction. One member of the Court of Criminal Appeals dissented, he being of the opinion that the evidence preponderated against the jury's finding on the issue of insanity. This court granted certiorari to consider all assignments of error, and particularly to determine whether the evidence preponderated against the jury's verdict.

The record is replete with testimony, both expert and lay, on the issue of insanity. Petitioner was described by friends and relatives who testified as a "loner," somewhat withdrawn and not gregarious. His parents and his wife both testified that after petitioner's return from Vietnam in 1969 he developed peculiarities in his personal traits, and also had a problem with alcohol. His wife testified that when petitioner was drinking his abnormalities were more apparent, and that on one occasion in October, 1971, he was particularly violent toward her, over a relatively small matter, after he had been drinking. At that time Mrs. Edwards consulted with her minister, separated from petitioner, and agreed to a reconciliation only after petitioner agreed to seek psychiatric help. The minister recommended Dr. Parks Walker of Memphis. Petitioner accepted the recommendation and became a patient of Dr. Walker in October, 1971. The doctor testified that petitioner had a schizophrenic personality and was suffering from schizophrenia. He further testified that petitioner responded to anti-depressant drugs and his condition improved. Petitioner was still under the care of Dr. Walker at the time of the homicide in June, 1972, although petitioner did not see the doctor very often during the spring months of 1972.

Lay testimony showed petitioner's personality quirks became more pronounced during the spring of 1972, particularly after petitioner quit taking his tranquilizers. Both his parents and a business associate testified they were concerned about him.

He was withdrawn, sullen, lost initiative and for three weeks prior to the homicide hardly worked at all. During that period he and his wife moved into a new home, which he was also going to use as an office from which to operate his business as a manufacturer's agent. The witnesses stated that during this period of time the petitioner would frequently have a "glassy" stare and a quizzical or smirking expression on his face at inappropriate times. There are instances in the record indicating that petitioner was domineering and authoritative in the home, and on one occasion he forcibly cut his young stepson's "long" hair. However, those who were close to him, including family members, felt that petitioner knew "right from wrong" at all times.

On the day of the homicide, Mrs. Edwards, petitioner's wife, was out of the house from noon until about 10:45 p.m., during the afternoon and evening, and he seemed very angry with her for being away from home all day. At about dinner time the parents of petitioner stopped at petitioner's house and invited petitioner and the two stepchildren of petitioner who were at home that evening to eat with them. The stepchildren accepted and went to the home of the parents of petitioner for dinner and to spend the night. Petitioner, however, declined because he was working on curtains in his new office. Both his parents and several other persons who saw petitioner during the afternoon and evening of the homicide said that he appeared somewhat withdrawn, but he was not hostile. He recognized everyone and no one detected any particular abnormality in his conduct. He had been drinking beer throughout the afternoon, but did not appear to be intoxicated. There is also testimony in the record that his sister, the victim of the homicide, had called him on one occasion during the evening, and was critical of him because of the way he had been treating his wife, particularly when he was drinking.

When petitioner's wife returned home, she found petitioner sitting on the porch with a can of beer in his hand. Mrs. Edwards sat next to him and asked if they could talk. Petitioner responded, "Well, it's all programmed out," and "I will do my talking to you when we get in the house." Shortly thereafter, petitioner's sister drove up, apparently unexpectedly. Mrs. Edwards invited Betty in for a beer. Betty sat down on the steps with Mrs. Edwards and spoke to petitioner, who did not respond. Finally, Betty asked her brother to get her a beer.

Mrs. Edwards testified that when petitioner went into the house, he walked from the kitchen hallway into the bedroom hallway and then back to the front door, and that she noticed he had his right hand behind his back, apparently concealing something. Mrs. Edwards leaped from the porch and said to Betty: "Get up off of the porch. I don't know what he has got in his hand. It looks like he may have that gun out." Betty, apparently not frightened by petitioner's behavior, again asked for her beer. Mrs. Edwards testified that she then watched petitioner walk back into the bedroom hallway and that she heard the sound of a drawer closing in the bedroom. When defendant returned to the porch with the beer for Betty, he sat down on the steps with her and entered into conversation.

Shortly thereafter, petitioner and his wife entered the house and petitioner shut the door leaving his sister on the porch. Mrs. Edwards let Betty into the house and they went to the bathroom to get an item which Betty had asked to borrow. Petitioner followed and stood blocking the bathroom doorway when his wife attempted to exit. Petitioner then went into the bedroom, and when his wife and sister followed, they found him lying on the bed. Mrs. Edwards testified that petitioner got up from the bed, pulled a pistol out of a bureau drawer and, without saying a word, fired a single shot at his sister. His wife ran from the house, and the petitioner fired two shots at her, narrowly missing her. Mrs. Edwards went to the house of a neighbor and had them summon the police and an ambulance. She also had the neighbors call Dr. Walker.

Immediately after the shooting and before the police arrived on the scene, petitioner called his mother and told her that he had shot his sister and was sorry. When the police arrived, he at first told them that his wife had shot herself. Later, he told the investigating officers that his "sister" had shot herself. He gave a third statement to the officers within fifteen minutes of the killing stating that he had killed his sister because she had sinned too much and that she was better off dead. He further stated that she was scolding him for mistreating his wife and that when he could not take it anymore, he shot her.

Following the homicide, Dr. Walker engaged the services of Dr. Garo Aivazian, Chairman of the Department of Psychiatry at the University of Tennessee Medical School, and they together evaluated the petitioner over the next several months. Both diagnosed petitioner's condition as schizophrenia. Both testified that in their opinion on the date of the shooting the petitioner was insane within the definition of the *M'Naughten* rule. Both expressed the opinion that petitioner was sane at the time of the trial. Both admitted that there were times when petitioner would know right from wrong. And, on cross-examination, Dr. Aivazian testified that petitioner was not psychotic when he first saw him on June 12, 1972, and also expressed the opinion that petitioner knew what was going on around him during the day of the homicide on June 7, 1972. There was also evidence of a history of mental illness in petitioner's family, going back several generations on both sides. The extent and nature of the illness is not shown other than by lay testimony.

Mrs. Nona Owensby, a licensed psychological examiner employed at Central State Hospital, was called as a rebuttal witness by the state. She testified that based upon her observation of the petitioner and study of his records she was of the opinion that petitioner was not psychotic or mentally deranged at the time of the shooting, and did know right from wrong. She expressed the further opinion that petitioner was feigning mental illness in an effort to avoid criminal responsibility, and testified to observations and conversations with petitioner which led her to this belief.

The petitioner offered in surrebuttal Dr. Fidelholtz, Director of the Forensics Services Division at Central State Hospital. He testified that the petitioner in his opinion was not mentally ill at the time of the trial. But said he had no opinion as to petitioner's mental capacity on the date of the homicide, nor was he aware that any member of his staff, which included Mrs. Owensby, had expressed any such opinion.

 Where there is evidence pro and con on the issue of sanity of the person charged with a crime, as there is in this case, the burden is on the state to prove that petitioner had the mental ability to distinguish between right and wrong, and knew the nature and quality of his act at the time of the act and with respect to the act. *Spurlock v. State,* 212 Tenn. 132, 368 S.W.2d 299 (1963); *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149 (1945). This burden can be met by the state through the introduction of expert testimony on the issue, or through lay testimony where a proper foundation for the expressing of an opinion is laid, or through the showing of acts or statements of the petitioner, at or very near the time of the commission of the crime, which are consistent with sanity and inconsistent with insanity. See *Brooks v. State,* 489 S.W.2d 70 (Tenn.Cr.App.1972); *Wilcox v. State,* 94 Tenn. 106, 28 S.W. 312 (1896); *Whitmire v. State,* 490 S.W.2d 179 (Tenn.Cr.App.1972).

Petitioner insists the state failed to carry its burden and that the evidence preponderated against the jury's finding that petitioner was sane at the time of the killing. Implicit in petitioner's argument is the insistence that the testimony of the psychiatrists on this issue must be accepted over lay testimony. Petitioner also stresses the testimony of his wife and family concerning his disturbed mental condition in the days before the killing and the history of mental illness in his family, and the lack of an apparent motive for his actions.

■ The jury is not required to accept testimony of a psychiatrist on the issue of sanity to the exclusion of lay testimony or to the exclusion of evidence of the actions of the petitioner inconsistent with sanity. If it were, as pointed out in *Brooks v. State, supra,* "[it] would effectively preempt our jury trial system on sanity issues and replace it with a system of trial by psychiatrists' opinions. We are unwilling, even if we had the power, to saddle society with so basic a change in our system of criminal jurisprudence."

■ In this state, "it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution. *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149. This applies to the expert opinions of medical men. *Crane Enamel Co. v. Jamison,* 188 Tenn. 211, 217 S.W.2d 945. Where there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in case. *Act-O-Lane Gas Service Co. v. Clinton,* 35 Tenn.App. 442, 245 S.W.2d 795; *East Tennessee Natural Gas Co. v. Peltz,* 38 Tenn. App. 100, 270 S.W.2d 591. Expert medical opinion regarding the functioning of the human body must always be more or less speculative. *Patterson Transfer Co. v. Lewis,* 195 Tenn. 474, 260 S.W.2d 182; *Great American Indemnity Company v. Friddell,* 198 Tenn. 360, 280 S.W.2d 908." *Sparkman v. State,* Tenn.Cr.App., 469 S.W.2d 692, 696 (1970).

In weighing the testimony of the psychiatrists in this case, the jury was faced with the fact that neither saw the petitioner on the day of the shooting. Dr. Walker saw the petitioner five days before the shooting and did not consider petitioner's mental condition serious enough to require treatment other than the taking of tranquilizers. The next time he saw petitioner was two days after the killing and Dr. Walker testified that petitioner was not psychotic at that time. Dr. Aivazian first saw petitioner

five days after the killing and testified that petitioner was not psychotic at that time or at any other time he saw petitioner. On the other hand, lay witnesses who saw petitioner before the shooting testified that petitioner appeared normal and capable of distinguishing between right and wrong. And even more significant than testimony of the lay observers was the fact that before the police arrived on the scene, petitioner telephoned his mother and told her that he had shot Betty and was sorry.

■ The jury's verdict indicates they found the state carried its burden of showing that petitioner was sane at the time of the homicide. In reviewing this finding to see if it comports with the evidence, we are bound by the rule that the verdict of the jury, approved by the trial judge accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173 (1963). We have read the record carefully keeping in mind the limits set forth in the *McBee* rule, and have concluded the evidence does not preponderate against the jury's finding that the petitioner, the moment he shot and killed his sister, knew what he was doing and knew right from wrong and that his acts were wrong.

■ Assignments five and six have to do with the order of proof. The trial court did not require the state to introduce all its evidence on the issue of insanity as part of its proof in chief, but permitted the state to introduce evidence on the issue in rebuttal to the testimony introduced by petitioner. The defense claims that it was seriously prejudiced by this. We find no merit in these assignments. In the first place the order of proof is more or less the accepted order in cases such as this. In the second place the matter lies in the discretion of the trial judge, and no conceivable prejudice to the defense has been demonstrated by reason of the order of proof which was followed. *Essary v. State,* 210 Tenn. 220, 357 S.W.2d 342 (1962); *Nichols v. State,* 200 Tenn. 65, 289 S.W.2d 849 (1956).

In assignments twelve and thirteen, petitioner insists that the state should have been required to call Dr. Fidelholtz as its witness or that he should have been called as a court's witness. The trial court can not dictate the witnesses to be called by the state. He does have the power to call a witness as the court's witness, but under the circumstances of this case, it would have been error for him to do so. *See Montesi v. State,* 220 Tenn. 354, 417 S.W.2d 554 (1967). Further, it should be noted that the witness, who testified in surrebuttal, was candid and frank in everything he said and was generally favorable to the defense in his testimony. There certainly could be no prejudicial error with regard to the manner in which this witness was called.

In assignment fourteen petitioner insists the trial court erred in allowing lay witnesses to express an opinion on the mental state of the defendant. Petitioner contends there was insufficient foundation laid to qualify these witnesses to express an opinion, and also that the questions asked failed to adequately state the *M'Naghten* rule. On reviewing the record, we find that petitioner did not object either to the form or content of the questions asked lay witnesses, nor did he question the adequacy of the foundation laid to qualify the witnesses to express an opinion on the issue of sanity. But, aside from this failure to object to the testimony, the record fairly shows that the opinions on petitioner's sanity voiced by lay witnesses were based upon their personal knowledge and observation as required by *Atkins v. State,* 119 Tenn. 458, 105 S.W.2d 353, and *Wilcox v. State,* 94 Tenn. 106, 28 S.W.2d 312.

There are a number of assignments of error questioning the competency of Mrs. Owensby to give an expert opinion, and her qualifications as an expert witness. There are also assignments to the effect that her testimony involved privileged communications made to her by the petitioner. Interestingly enough, no objection was made by counsel for the petitioner either as to the qualifications of Mrs. Owensby or as to the content of her testimony. Indeed, at one point, counsel conceded that she was qualified and that he had no questions as to her qualifications. In their brief filed in this court, counsel for petitioner have appended newspaper articles and other items tending to show that Mrs. Ownsby has since been discredited and has been discharged by the state. The findings of the Grievance Procedure Board of Review Decision reinstating Mrs. Owensby as an employee of Central State Hospital have also been tendered to this court for consideration. Neither of these matters appear in the trial record and, consequently, we cannot take cognizance of them. We would note, however, that most of the testimony of Mrs. Owens was factual, being based on her observation of petitioner and on statements by petitioner, and would be admissible whether Mrs. Owens was an expert witness or not.

Throughout the trial, counsel for the petitioner sought to have the trial court give instructions to the jury as to what the legal effect of a finding of not guilty by reason of insanity would be. Specifically they sought to have the court charge the jury from the Tennessee Code as to the statutes on hospitalization of a person found to be mentally ill. Numerous special requests were tendered on this point, as well as repeated requests throughout the trial. The trial court declined to give these instructions, because he felt that it was not the jury's prerogative to be concerned about the legal effect of their verdict, but only to make a finding on the evidence presented to them. This action of the trial judge has been assigned as error.

Authorities in other states on this point are conflicting. In some states by statute the trial judge is required to instruct the jury as to the effect of a verdict of not guilty by reason of insanity. We do not have such a statute, however, and Tennessee law generally is to the effect that the trial judge is not supposed to tell the jury what the legal effect of their verdict is. See *Harbison v. Briggs Brothers Paint Manufacturing Company,* 209 Tenn. 534, 354 S.W.2d 464 (1962). It is not relevant to the issue of petitioner's guilt or

innocence. And, as pointed out by the trial judge in colloquy with counsel, there were so many options and alternatives available, depending upon the mental condition of the accused, it would be highly conjectural and would involve the jury in speculation as to what might happen to the accused. Counsel for the defendant did, in their final arguments, strongly suggest that the accused would not be released outright, but that he would be hospitalized if found not guilty by reason of insanity. Then too, the statutory provision for commitment of persons found not guilty by reason of insanity, T.C.A. 33–709, is not a mandatory provision. It simply provides that the District Attorney may initiate judicial hospitalization procedures under T.C.A. 33–603 or 604 and that the court may order the defendant found not guilty by reason of insanity hospitalized upon the certification of two licensed physicians that the defendant is substantially likely to injure himself or others. And, in view of the fact that petitioner relied on the defense of insanity at the time of the offense with which he was charged, and the further fact that all evidence is to the effect that *he is now competent,* no prejudice could result to petitioner by the refusal of the trial court to instruct the jury as requested in this case.

■ Petitioner also contends the trial court erred in refusing to permit counsel, on voir dire, "to go into the meaning and effect of a verdict of not guilty by reason of insanity." We agree with the Court of Criminal Appeals that "the purpose of voir dire is stated in the case of *Smith v. State,* 205 Tenn. 502, 327 S.W.2d 308, and the trial court did not abuse his discretion in controlling the extent of the voir dire examination."

■ There is an assignment of error, Number eleven, with regard to the final argument of the District Attorney General. It is claimed that the District Attorney inferred that the accused would go free if found not guilty by reason of insanity. While this is a possible inference from the argument, the remarks were actually directed at the state's theory that the accused was simulating mental illness in order to escape punishment. Further, no objection was made to the argument, and defense had the opportunity to and did reply to the argument. Under these circumstances, we see no prejudicial error in the argument of the District Attorney General.

■ Numerous special requests for jury instructions were tendered to the trial court and were refused. Each of the requests is the subject of an assignment of error. With the exception of those pertaining to the legal effect of a verdict of not guilty by reason of insanity, which has been heretofore mentioned, all of the special requests were adequately covered in the general charge given by the trial judge to the jury. It is not error to refuse a special request where the charge as given fully and fairly states the applicable law. *Bostick v. State,* 210 Tenn. 620, 360 S.W.2d 472 (1962).

Assignments of error twenty-seven through twenty-nine and assignments thirty-one and thirty-two involve the trial court's instructions to the jury. The Court of Criminal Appeals discussed each of these assignments in the majority opinion and concluded that the charge was without material error. No attempt was made in the brief filed in behalf of petitioner to show specifically where the Court of Criminal Appeals was in error in its conclusion. Despite this, we have considered the assignments anew and find ourselves in full agreement with the Court of Criminal Appeals that the charge given by the trial court was complete and accurate.

■ We also agree with the Court of Criminal Appeals that the trial court acted properly in considering a question asked by a juror, on the jury's return to the courtroom during deliberation. "A juror asked the court a question dealing with insanity, and the court refused to answer, saying instead that it was a question for the jury to determine from the instructions and the evidence. This was not error, because in view of the complete instructions on insanity already given, any additional instruction would have served only to confuse the jury

or unfairly emphasize a certain point of law. Furthermore, since the court did not give any instruction, he was at liberty to make an oral response, without reducing it to writing."

 Supplemental briefs have been filed on behalf of petitioner, asserting that the trial court was in error in the method of selecting the grand jury and the trial jury in that there had been a systematic exclusion of women from the jurys. This matter was mentioned briefly in the motion for a new trial, but there is no evidentiary record upon which systematic exclusion of women could be found. We do not have any record at all with regard to the method of the selection of the grand jurors, and the voir dire selection of the jurors in the present case contains no exceptions or objections with regard to the exclusion of women. There being no factual basis for this assignment, it must be overruled.

Petitioner's conviction is sustained, and the opinion of the Court of Criminal Appeals is affirmed.

HARBISON, J., and DYER, Special Justice, concur.

HENRY and FONES, JJ., dissent.

HENRY, Justice (dissenting).

I cannot conscientiously concur in the conclusions reached by my colleagues.

### I.

In the totality of the facts and circumstances of this tragic case, I am impelled to the view that this demented and tormented defendant was not legally responsible for his acts at the time he shot and killed his sister. I reach this conclusion on the basis of the State's proof which I regard as being conclusive on the matter. Had a motion for an acquittal been made at the conclusion of the State's proof in chief it would have been well grounded. The proof offered by the defendant merely served to bolster that which the State had already established beyond a reasonable doubt and to a moral certainty by the massive weight of its own proof.

Before proceeding to an analysis of the State's proof and a documentation of the foregoing conclusions it should be pointed out that a substantial portion of the prosecution's proof came from members of a family torn by tragedy and demoralized by domestic difficulties. It must be analyzed in that light.

It should also be borne in mind that prior to the trial all concerned had certain knowledge that the sole issue would be insanity at the time of the offense. The record shows that on 8 December 1972, a hearing was conducted on defendant's request for a bond. At this hearing the court heard testimony from Dr. G. H. Aivazian, Chairman of the Department of Psychiatry at the University of Tennessee Medical College. He testified that defendant suffered from schizo-affected schizophrenia, a very serious mental malady requiring continuous observation and treatment. The State's attorney represented to the court that he had talked with defendant's wife and she was apprehensive that, if released, he would harm her, or the children, or even his own parents. Viewed from any angle this constituted an admission by the State that defendant was not of sound mind.

Pursuant to this hearing he was released on bond but upon the condition that he not leave the Shelby County Jail until admitted to a suitable hospital for treatment and not leave the hospital without leave of the court. An order was entered to that effect. Thus defendant's insanity became the *prima facie* law of the case. The State with this obvious knowledge, from its first witness forward, anticipated the defense and sought to rebut the presumption of insanity. This distinguishes this case from the normal prosecution wherein there is no prejudgment of the issue of sanity.

It should further be pointed out that this case was tried in the context of the ancient and archaic *M'Naghten* Rule: [1]

---

1. M'Naghten's Case, 1 C. & K., 130; 10 Cl. & F. 200, 8 Eng.Rep. 718 (H.L.1843).

[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as *not to know the nature and quality of the act* he was doing; or, if he did know it, that he did not know he was doing what was wrong. (Emphasis supplied). 8 Eng.Rep. at 722

Tennessee follows the *M'Naghten* Rule. *Spurlock v. State,* 212 Tenn. 132, 368 S.W.2d 299 (1962).

It is important, as we analyze the proof, to recognize, and keep firmly in mind that the rule is in the conjunctive, and notwithstanding cases which short-cut the rule and put it on the basis of knowing right from wrong only, the rule requires the all important additional element of knowledge of the *nature and quality* of the act. This distinction was blurred throughout the trial of this criminal action. Moreover, the majority opinion ignores this critical element of *M'Naghten.*

It should further be borne in mind that the testimony of lay witnesses must be based on "facts and acts", but "their conclusion from these facts does not necessarily create an issue or prevent the Court from finding the true condition as a matter of law." *Hammond v. Union Planters Nat. Bank,* 189 Tenn. 93, 105, 222 S.W.2d 377, 382 (1949). The expression of an opinion, absent facts, is not evidence. *Melody v. Hamblin, et al.,* 21 Tenn.App. 687, 115 S.W. 237 (1937).

With these preliminary statements of applicable legal principles in mind, we proceed to an analysis of the State's testimony.

## II.

The State first called the defendant's wife. She unfolded the story of defendant's gradual but progressive deterioration over a two-year period. She painted a picture of a man who was a "loner", whose personality was characterized by insecurity, hostility and resentment. During the latter part of 1971, after a series of bizarre incidents, she consulted with the minister of the church she and defendant attended with regularity. He advised that defendant seek psychiatric care. Subsequently she conditioned the continuation of their marital relationship upon his doing so.

Accordingly, he was first seen by Dr. Parks Walker, a practicing psychiatrist, in November 1971, some seven months before this tragedy. Dr. Walker prescribed medication designed to elevate his spirits from the moods and depressions from which he suffered. Several weeks before the tragedy, defendant, without medical advice, stopped taking the medication.

The events leading up to the consultations with Dr. Walker were indeed bizarre. His wife had a mastectomy in May 1971. There was subsequently a recurrence and her prognosis is poor. This distressed him and he began to talk of suicide and to talk generally about death.

While he apparently was worried to the point of distraction over his wife's condition, simultaneously he seemed determined to agitate her and keep her in a state of mental turmoil. He would alternate between being kind or solicitous and cruel or sadistic. He seemed to take pleasure in tormenting his children.

While his wife, who emerges in this record as an anguished but strong and gracious lady, was gallantly trying to live but bravely facing the virtual certainty of her eminent death, he bought a cemetery lot, forced her to go see where he proposed to bury her, and chattered incessantly on the details of her funeral.

Some time after she returned from the hospital there was a horrible scene in her bedroom one night after she had changed into night clothing. He cursed and abused her, broke an ash tray, broke his eye glasses, broke part of the facing off one of the doors and damaged the bannister on the stairway. Then came an incident so vile and repulsive as to be foreign to the conduct of any *sane* person. He took his hand and scratched the scar area on the breast upon which she had had the mastectomy, and then grabbed the other breast, bruising

it and telling her that she did not deserve to have that one. She testified that he was in "a wild state."

It was following this incident that she imposed as a condition of reconciliation that he seek psychiatric care.

As aforesaid he discontinued taking his medication about three weeks before the tragedy.

For three or four months before the tragedy he had "a very strange smile . . . at very inappropriate times . . . a very silly kind of a grin"; at times he had "a mad state" and "one eye would get larger than the other." In the two or three weeks immediately preceding the tragedy he was in a state of deep depression, neglected his work, withdrew completely from his family, and did nothing but eat and sleep. His wife testified that he was "completely out of touch with reality" and "he did rather seem to be in another world."

When she was next door immediately following the shooting, she told her neighbor, "that man is crazy." The first person she called was her husband's psychiatrist.

Notwithstanding this proof positive of mental derangement, she testified, by affirmative response to counsel's questions, that he appeared to know what he was doing and to know the difference between right and wrong. I would reject these conclusions since they are wholly and utterly inconsistent with and repugnant to her entire testimony. Moreover, she did not testify to the first part of the *M'Naghten* equation, i. e., knowledge of the "nature and quality" of his acts.

Her testimony may not fairly be equated with any conclusion except mental derangement and abnormality amounting to insanity.

The State next called six policemen whose cumulative testimony further cemented the proof of insanity. Upon their arrival he told them, "My wife shot herself." This notwithstanding the fact that the body of his dead sister, Betty, was in plain view. Next he told one of the officers that his sister shot herself. Next he signed a statement admitting that he shot his sister "because she sinned too much." Enroute to the police department, he said he did not know who shot his sister—all this within a span of approximately thirty minutes.

As to his appearance, one or more said that his eyes were dilated and glassy and he was almost at the point of crying. One said he did.not seem upset and he appeared to know what was going on; another said he showed no remorse, didn't seem upset and "seemed like he was kind of proud of what he had done; seemed sort of happy about it; sort of sick grin." One of them said he "had kind of a small grin on his face; kind of seemed like he was happy."

Next the State called Phyllis Worthy, sister of defendant's wife. Without reciting any facts or circumstances, she testified that he appeared normal on the afternoon of the tragedy.

Then Michael Richardson, husband of Mrs. Edwards' sister testified. By affirmative response he testified that on the afternoon of the tragedy defendant knew the nature and quality of his acts and had the ability to tell the difference between right and wrong. He too observed the "silly grin" as defendant sat in the squad car after the killing.

Mrs. Michael Richardson testified by affirmative response that during all the years she knew him he knew right from wrong.

Neither of the Richardsons detailed "facts and acts" upon which they based their opinion.

The State's final, and we think conclusive, proof of insanity came from Mrs. Ben Edwards, mother of the defendant.

This tortured and tormented lady, required by the State to testify as a witness against her son for the murder of her daughter, unfolded a story of human misery.

She established that this defendant's ancestors and relatives on both sides of his family, had been plagued by mental instability. On his mother's side, an uncle died while a patient at Western State Hospital.

One of his first cousins suffered from paranoid schizophrenia and spent a year in a sanitarium in Dallas. Another suffered from the same malady. His mother was unstable and at one time had had a drinking problem. She had attempted suicide on two occasions.

His father's grandmother had died at Whitfield, the Mississippi Insane Asylum. His great uncle died while a mental patient at the Veterans' Administration Hospital at Murfreesboro. His grandfather had undergone mental treatment at Wallace Sanitarium in Memphis. His father also had a drinking problem at one time.

It is a matter of common experience and universal knowledge that insanity tends to run in families.[2]

This deeply troubled mother told of her son's return from Vietnam and how his personality began to degenerate and how his condition grew progressively worse. She told of how extremely close defendant and his sister, Betty, had always been.

She told of his telephone call to her on the night of the murder and of hearing him say:

Mama, I am sorry. I have just shot Betty.

She told of going by to see him on the late afternoon of the tragedy. She had become increasingly concerned over his condition. He had progressively become more withdrawn and depressed. She says that he looked very strange, very withdrawn and had a glassy stare.

And yet she testified by affirmative response to questions, that he appeared to know what he was doing, was conscious of his actions and appeared to know the difference between right and wrong.

This was her testimony, but it was not based on "facts and acts." These affirmative responses were *non-sequiturs* since the tone and tenor of her whole testimony was to the contrary.

This concluded the State's proof.

In view of the defendant's plea, the statements of counsel on voir dire, and the admission by counsel for defendant in open court that defendant shot his sister,[3] the whole viable and triable issue was the sanity of the defendant. The State could have relied upon the presumption of sanity, and made out its case solely by the police officers with no allusion to defendant's sanity. Instead, and for reasons I cannot fathom, the State elected to raise the issue and, through its witnesses, sought to establish that defendant was sane.

This trial strategy boomeranged. Instead of establishing sanity, the totality of the State's proof established insanity beyond any reasonable doubt.

### III.

Since defendant's proof was merely cumulative it would serve no useful purpose to comment on it in great detail.

Defendant's father told of the steady decline in defendant's career, his loss of interest in his job, the loss of part of his marketing territory, the mounting depression from which he suffered, and complete withdrawal from his family and friends; and of his own deep concern over his son's condition.

The Vice-President for Sales and Marketing of the Company for which defendant worked, elaborated on the deterioration of his job performance and of coming to Memphis to see about him.

Two ministers testified and told of his condition. One of them had seen him the

2. See, e. g., B. Maloy, Nervous and Mental Diseases 443 (1935); G. Smoot, The Law of Insanity 73 (1929). In subsequent testimony, Dr. Parks Walker stated that a predisposition to schizophrenia is or can be hereditary.

3. At an early stage of the trial, counsel for the defendant stated, in open court, and in the presence of the jury:

The identity of George Edwards is not in dispute. The fact that he did shoot his sister is not in dispute. The corpus delicti is established. The offense did occur in Shelby County and within the jurisdiction of the Court, and the weapon that has been exhibited is the weapon that was used. So we don't have to prove any of that.

day before the tragedy and he was withdrawn, anxious, tense, had a "beady" stare and a "smirk" or "funny" smile. The other had referred him to a psychiatrist.

Doctor Parks Walker, a Memphis Psychiatrist, described defendant as being introverted, hypersensitive, inhibited, seclusive, withdrawn and as having a paranoid type personality with all the major symptoms of schizophrenia. Among other things he stated:

> [S]chizophrenia is a major mental disorder where a person has a loss of good contact with reality, where his judgment becomes impaired and where his behavior may be such that legally he would engage himself in what might be called insane behavior.

Initially he treated him with Navane, a major tranquilizer used primarily for people with psychotic conditions. Subsequently he treated him with other anti-depressants.

Doctor Walker prescribed four (4) major symptoms of schizophrenia:

1) Ambivalence (e. g., love and hate)
2) Disturbance in expression or emotions (silly grin)
3) Failure to show emotions (e. g. blank stare, glassy look)
4) Disturbance of thought processes (e. g., chain of thought, allusions, hallucinations, paranoid thinking) [4]

Doctor Walker further testified that it was typical of schizophrenia that it would flare up and subside, or come and go.

He last saw defendant on May 31, 1972, one week before the tragedy. At this time, he had discontinued the use of his medication, was deeply depressed, had stopped work, and was lying around the house in a morose and deeply disturbed state. The doctor put him back on medication and advised him to return in two weeks and that, if he was not better he would be hospitalized.

He further testified that at the time of the killing the defendant was laboring under such a defect of reasoning from disease of mind as not to know the nature and quality of his act, or if he did know it, that he did not know what he was doing was wrong.

Defendant next called Dr. Garo H. Aivazian, a Diplomate of the American Board of Psychiatry and Neurology in psychiatry, a Fellow of the American Psychiatric Association and Chairman of the Department of Psychiatry at the UT Medical College in Memphis.

Doctor Aivazian saw him on June 12, 1972, five days after the murder and treated him through August 14, 1972.

He diagnosed his condition as schizophrenia. He testified:

> My opinion is that at the time of the shooting (defendant) was psychotic to a degree whereby his ability to recognize what was around him as the environment and to test the environment and its realities was impaired to a degree whereby he was not capable of deciding between right or wrong and was not capable of adhering to any decision because he could not decide between right and wrong.

IV.

The State, over the vigorous and repeated objection of the defense, called Nona Owensby, a psychological examiner, or tester, to testify to the mental capacity of the defendant, at the time of the murder.

Permitting her to testify, as a rebuttal witness, was prejudicial error. The court, in its discretion, permitted her to testify after observing that "this evidence would have been and possibly should have been submitted by the State in its proof in chief." In the peculiar posture of this case with the State going forward with the proof on the issue of sanity, to permit it to hold back a portion of its proof, was both unfair and prejudicial. Her testimony was not rebuttal in any sense. She rebutted nothing. Her testimony was simply a continuation of the State's proof in chief. We cannot brush this aside, as does the majority opinion, by chanting the old cliche that

4. The State proved conclusively that he had all these symptoms.

this "lies in the discretion of the trial judge" and asserting that "the order of proof is more or less the accepted order in cases such as this." I agree with these general propositions but they apply in a case wherein the normal procedure is followed, i. e., a case wherein the State proves the murder, the defendant offers evidence of insanity and the State counters with rebuttal proof designed to show sanity.[5] But this case did not fit into this conventional pattern. The majority asserts that "no conceivable prejudice to the defense has been demonstrated." Any lawyer who has ever announced "ready" in a criminal case knows that this was an unmitigated disaster. *Inter alia* it permitted the case to go to the jury with the testimony fresh on its minds from an unqualified "expert" who misstated her qualifications (see *infra*) with no reasonable opportunity to rebut.

After giving her name, the first words she uttered were false:

> I am *the psychologist* at the Forensic Services Division of Central State Psychiatric Hospital. (Emphasis supplied).

After the trial of this lawsuit, in a commendable and lawyerlike display of candor and forthrightness, Honorable Robert H. Roberts, the distinguished Advocate General, addressed a letter to counsel for the defendant in which he advised:

> General Ashley and I have discussed this case and have concluded that we have a *responsibility to the Court to advise them concerning the misrepresentation of qualifications by Mrs. Nona Owensby* at the trial, and would suggest that even though *the material you have filed in that regard is de hors the record, that the Court, because of the unusual circumstances, should consider it.* If you have no objection, I would like to make that announcement to the Court prior to your opening argument on the merits. (Emphasis supplied).

Among the "material" filed was a news story of an investigation of certain person-

nel at Central State Hospital wherein Nona Owensby is quoted as admitting that she had been "sloppy" in her use of the term "psychologist."

The Findings of the Investigative Committee were also filed. *Inter alia* the Committee found:

1. That she exceeded her authority in testifying before courts regarding matters of probation, parole, suspension of sentence, leniency, and insanity.

\* \* \* \* \* \*

4. That she flagrantly exceeded the authority of her license as a Psychological Examiner.

5. That she failed or refused to pursue clarification of the extent of her licensed authority when brought to her attention and continued her activities.

6. That she furnished courts, attorneys for patients and district attorneys with "Qualifications as an Expert Witness" containing information that was inaccurate and misleading, inferring that her professional education and capabilities exceeded those actually possessed.

\* \* \* \* \* \*

10. That she held herself out to be a psychologist by using her "working title" as an indication of professional qualifications tending to mislead courts before whom she gave testimony, attorneys representing patients, district attorneys, patients, and staff at FSD.

Section 63–1105 T.C.A. recognizes two (2) levels of psychological practice, viz.: "(a) 'psychological examiner' and (b) 'psychologist'".

Section 63–1106 T.C.A. defines the "practice of psychological examiner" and provides as follows:

> A person practices as a "psychological examiner" within the meaning of this chapter when he holds himself to be a

---

5. The State is not bound to establish defendant's sanity but if its proof, or the proof of defendant raises a reasonable doubt the burden

of proof shifts to the State. *Covey v. State,* 504 S.W.2d 387 (Tenn.Crim.App.1973).

psychological examiner and/or renders to individuals or to the public for remuneration any service involving the application of recognized principles, methods and procedures of the science and profession of psychology, such as interviewing or administering and interpreting tests of mental abilities, aptitudes, interests and personality characteristics, for such purposes as psychological evaluation or for educational or vocational selection, guidance or placement. The psychological examiner practices the following only under qualified supervision; over-all personality appraisal or classification, personality counseling, psychotherapy or personality readjustment techniques.

The ensuing section defines the "practice of psychologist." Section 63–1111 states the qualifications of a psychological examiner and the next section those of a psychologist. Clearly Nona Owensby is not a psychologist, and does not have the requisite educational qualifications. The majority opinion so treating her is in error.

This, of course, does not preclude her from testifying but she does so only as a *layman*, albeit a well-informed one. But when she represents to a jury that she is a *psychologist*, it materially and adversely affects their evaluation of her testimony.

Irrespective of her qualifications or the lack thereof, her testimony is suspect in substantial particulars.

1. She had never seen defendant until after the murder and did not possess the requisite professional qualifications to make an evaluation on the basis of reports and information which she had.

2. Dr. Jacob Norman Fidelholtz, is the head of the Forensic Services Division at Central State Hospital. Nona Owensby is a member of his staff. He testified in substance that neither he nor any of his staff had formed or expressed any opinion as to defendant's sanity at the time of the murder.

3. She made no notes of any interviews with defendant and was unable even to give the date of a single interview.

4. Defendant was being treated with major tranquilizers during his stay at Central State and, therefore, was under the influence of them during each interview.

5. Dr. Fidelholtz testified that Drs. Walker and Aivazian were in a substantially better position to diagnose defendant's condition than was he.

6. She was under the erroneous impression that one of the psychiatrists who testified in this case had diagnosed defendant's disorder as being manic-depressive, an entirely different type mental disorder.

7. The examination at Central State was designed to determine present sanity and not that at the time of the murder.

I cannot conclude from a careful study of the record that her testimony was worthy of credible acceptance. I reject it.

It is my opinion, after a concentrated study of the record in this case, that the evidence massively preponderates in favor of a finding that George Edwards, on June 7, 1972 was "laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong." If George Edwards was sane on the date of the killing, he was guilty of a brutal murder and should have been found guilty of murder in the first degree. The jury obviously accepted his plea of insanity but refused to bring in a not guilty verdict. (See *infra*).

I am fully cognizant of the rule of *McBee v. State*, 213 Tenn. 15, 372 S.W.2d 173 (1963), and, therefore, agree that the verdict of the jury, approved by the trial judge, accredits the testimony and theory of the State. There were no conflicts, and I accept the testimony of all the witnesses at full value (except Owensby) and in so doing "accredit the testimony" of the State's witnesses. The fair import of the collective testimony of the State in chief validates the plea of insanity. If we follow *McBee* we should reverse.

The State's case, in the last analysis, must stand or fall upon the testimony of

Nona Owensby. *McBee* does not require that we accept testimony when she knowingly deceived the jury as to her qualifications. Critical to the jury's acceptance of her testimony was the belief that she was *the psychologist at the Forensic Division.* We cannot accredit that which we know was based, in substantial part, on false testimony.

Our task on appellate review is to determine that the State carried its heavy burden of proving sanity beyond a reasonable doubt. If the evidence is evenly balanced, or in equipoise, there is reasonable doubt and defendant must be acquitted. *King v. State*, 91 Tenn. 617, 648, 20 S.W. 169 (1892); *Dove v. State*, 50 Tenn. 348 (1871); *Covey v. State, supra.*

### V.

I would sustain the first three assignments, reverse and remand for a new trial.

I am not content with the *M'Naghten* Rule. I regard it as being at variance with current medical theories of mental illness. The assessment of mental capacity should be left to those trained in the behavioral sciences. The concept of "right and wrong" is essentially moral and ethical and operates to force witnesses (lay and expert), juries, and judges to make moral rather than medical, social and legal judgments. It is the present policy of our law that "[u]ntil a definitely superior rule of law" comes into being we will "trudge along the now well-traveled pike blazed more than a century ago by *M'Naghten*." *Spurlock v. State, supra*, 212 Tenn. at 140, 368 S.W.2d at 303. While I do not agree to trudge along with *M'Naghten*, I recognize that such is not an issue in this controversy.

There is a glaring deficiency in Tennessee statutory law as it relates to the disposition of criminal defendants found not guilty by reason of insanity. All will agree that such a criminal defendant, acquitted by a jury, should not be released to return to society, and, I think all will agree that confinement in a penal institution is inappropriate restraint for the mentally ill. Our law gives the jury no alternative. Either it sends a mentally ill defendant to the penitentiary or it releases him upon society. Given this choice societal instincts of preservation demand confinement in the penitentiary.

The Law Revision Commission came to grips with this problem. § 40–2321, of its proposed criminal code, provides that in certain designated cases (including homicide), if a defendant is found guilty by reason of insanity:

[T]he Court shall order him to be committed to the custody of the Commissioner of Mental Health to be placed in an appropriate institution for custody, care and treatment.

The Commission's comment under this proposed section reads, in pertinent part, as follows:

*Tennessee is now the only state not having statutory procedures for the treatment of criminal defendants acquitted on the defense of insanity.* The resulting uncertainty as to the disposition of the incompetent offender has resulted in an *unreasonable* resistence to the proper use of the insanity defense in this state.[6] (Emphasis supplied)

This proposed Code provision now pends before the Legislature. The adoption of some procedure for proper disposition in such cases is a matter of urgent public concern. Tennessee desperately needs some mechanism for providing the public with protection and simultaneously insuring that the unfortunate victims of mental disease are dealt with in a humane manner. Their restoration to useful and productive citizenship is a matter of compelling state interest.

---

**6.** The Legislature, by Chapter 464, Acts of 1974 (Adj. S.), carried into the Code as Sec. 33–709, provided a limited procedure for the judicial hospitalization of persons adjudged not guilty by reason of insanity. In summary form, this statute provides that when a criminal defendant is acquitted by reason of insanity, the district attorney general *may* seek hospitalization if he determines hospitalization to be justified. Neither the trial judge nor the jury has any power; the matter is left solely to the discretion of the attorney general. The ensuing procedure is cumbersome and awkward, and, in my view is inadequate.

Trial and appellate judges and jurors labor under the difficulty arising from the State's failure to act in this area of vital public concern. Twelve jurors and nine judges have now considered George Edwards' case. I am persuaded that if they had a choice each of these twenty-one Tennesseans would say without a moment's hesitation that he should be placed in a mental institution for care and treatment. I believe all would agree that sending him to the penitentiary would be inhumane. Time was when the lame, the halt, the physical misfits and the mentally diseased were thrown over a cliff because they were a threat to the security of the group. George Edwards is such an outcast. We are throwing him over the cliff because there is a void in our law.

I am convinced that this defect in our law accounts for this conviction and, while I deplore a result that releases him from all restraint, this is the legal result to which I am impelled.

This lawsuit was ably and vigorously tried by skillful prosecutors and astute defenders. The trial judge presided with meticulous fairness and in a completely judicious manner. The comments I have made are not intended to be critical of their actions. Quite to the contrary, I applaud all of them and regard this as a model trial from a standpoint of trial decorum.

I am authorized to state that Justice Fones concurs in this dissent.

OPINION ON PETITION TO REHEAR

COOPER, Chief Justice.

George S. Edwards has filed a petition to rehear insisting that the court "overlooked determinative facts in two areas of crucial importance," in affirming the conviction of Mr. Edwards for second degree murder. Specifically, petitioner questions the view of the majority of the court of "the Owensby testimony," and assignments questioning the trial court's instructions to the jury. The argument advanced in support of the petition is essentially the same argument made to and considered by the court in rendering its opinion in this case; however, out of deference to counsel, we have reconsidered the issues. On doing so, we adhére to the conclusions stated in the original petition filed in this case.

The petition to rehear is overruled.

HARBISON, J., and DYER, Special Judge, concur.

FONES and HENRY, JJ., dissent.