**Max Gordon COX, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee.

Nov. 10, 1976.

Certiorari Denied by Supreme Court
April 25, 1977.

William F. Durham and Arthur McClellan, Gallatin, for appellant.

R. A. Ashley, Jr., Atty. Gen., Donald S. Caulkins, Asst. Atty. Gen., Nashville, O'Brien Price, Dist. Atty. Gen., Springfield, Lance B. Bracey, Asst. Dist. Atty. Gen., Springfield, for appellee.

## OPINION

GALBREATH, Judge.

We must reverse the conviction of the appellant for murder in the first degree for a number of reasons.

It was proved at the urging of the State that the defendant was insane for some years following the murder and necrophilic rape of the teen-age victim in Gallatin near midnight of the 1st day of February, 1966. This insanity frustrated repeated efforts on behalf of the defendant to be tried on the indictment which was not served on him because of his mental incapacitation until more than two years after its return.

The record leaves no reasonable room for doubt that from the time he was first evaluated in 1966 at Central State Hospital until after the decision by the United States Supreme Court in *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 in 1972 the defendant was insane. *Jackson* held that persons accused of crime who could not be tried because of insanity may not be detained on criminal charges beyond a reasonable time. It takes little reading between the lines to appreciate the dilemma the State confronted in the face of *Jackson.* An obviously insane person accused of committing one of the most heinous crimes possible would have to be released from criminal custodial restraint or found, in the face or prior adjudications to the contrary, to be sane and tried, hopefully, before the restraint could be termed unreasonable. Inasmuch as the United States Supreme Court had held that some three and one half years was an unreasonable period of time, it is difficult to understand how almost ten years could, under any view, be considered reasonable, particularly when the delay was occasioned, in large measure, by the State's insistence that the defendant throughout the decade that passed was not able to advise counsel in his defense.

The last of a number of unsuccessful attempts on the appellant's behalf to have his sanity restored in order that he could be tried was made on the 18th day of October, 1973, and a jury, for the fourth time as in 1966, 1970, and 1973, found Cox to be insane. The proceedings of the 1973 hearing are before us in bill of exception form. But we have only the minute entries setting out the judgments in the prior hearings and on the final petition successfully seeking restoration on the 9th day of September, 1975.

The record in this case is in a deplorable condition. The motion to dismiss for failure to grant a speedy trial is included in the technical record, but nowhere do we find a copy of the minute entry overruling it. Nor is there a bill of exceptions preserving the evidence presented at the last restoration hearing in which the defendant was found insane almost a year after his motion of September 24, 1974 to dismiss for denial of a speedy trial was rejected. However, we are able to discern from the bill of exceptions and the entire record that the motion to dismiss for lack of a speedy trial was ruled on adversely to the defendant's contention and that he was a year later found to be competent to stand trial.

■ We hold, inter alia, that the trial judge was in error in failing to grant the defendant's motion to dismiss the indictment because the accused had been denied his right to a speedy trial for the reasons set out in *Jackson v. Indiana,* supra. In that case, as here, the trial court found that the accused over a period of years "lacked comprehension sufficient to make his defense" and ordered him, as was Cox in this case, committed to a state facility until such time as he could be certified sane and competent to stand trial.

Counsel argued that Jackson's commitment under these circumstances amounted to a "life sentence" without his ever having been convicted of a crime, and that the commitment therefore deprived Jackson of his Fourteenth Amendment rights to due process and equal protection, and constituted cruel and unusual punishment under the Eighth Amendment made applicable to the States through the Fourteenth. The trial court denied the motion. On appeal the Su-

preme Court of Indiana affirmed, with one judge dissenting, 253 Ind. 487, 255 N.E.2d 515 (1970). Rehearing was denied with two judges dissenting. We granted certiorari, 401 U.S. 973, 91 S.Ct. 1203, 28 L.Ed.2d 322 (1971) . . . [W]e conclude that, on the record before us, Indiana cannot constitutionally commit the petitioner for an indefinite period simply on account of his incompetency to stand trial on the charges filed against him. Accordingly, we reverse. *Jackson v. Indiana*, supra, 406 U.S. at 720, 92 S.Ct. at 1849.

The State correctly points out that the proof in *Jackson* was to the effect that the defendant in that case would, in all likelihood, never become competent, whereas in the instant case the defendant was determined to be sane after some ten years of hospitalization for mental disease. We are impressed with the fact that for almost three times the period found to be sufficient for the restoration of sanity in *Jackson*, the defendant was consistently determined to be incompetent by jury verdict to stand trial. He was in this status at the time his *Jackson*, type motion to dismiss was overruled. We cannot escape the conclusion that under almost any conceivable circumstances ten years is such a delay between indictment and trial that to deny repeated requests for disposition of the case is violative of the Federal and State guarantees of speedy trial. 6th Amendment, *U.S. Constitution* and Article 1, § 9, *Tennessee Constitution*. Those matters delineated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) to be considered in making this determination, i. e., the length of the delay, (2) the reason for the delay, (3) the defendant's repeated assertion of the right, and (4) prejudice to the defendant, are all factors in this case.

The delay was perhaps the longest ever to come to the attention of this Court. The reason for the delay was because the State opposed both the request of the defendant to be tried and certifications by the staff of Central State Hospital to the effect that the defendant, while medicated, was sane. The State was successful for many years in convincing juries that the accused should not be tried. The prejudice is obvious. There was a strong likelihood that the defendant could have demonstrated that he was insane at the time the crime was committed if tried soon after being served with the indictment after the passage of the first two years when he was found to be sane by the examiners. Four juries did find him insane after he had been certified competent by the staff at Central State Hospital during the years involved. It is quite conceivable that these same juries would have found that the insanity predated the crime. Indeed, from the medical history found in the record, it is quite probable such a finding would have been made. Sane or not, the anxiety and mental anguish that must accompany the frustration of the right to assert a defense and the increasing difficulty to establish it after many years must be even more pronounced when one is forced to spend the intervening time in a madhouse for the criminally insane.

■ In reversing, we also sustain assignments alleging that the rights spelled out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were not adequately explained to and waived by the defendant before the investigating police obtained from him highly incriminating admissions. This is not surprising since the custodial investigation took place prior to the decision in that landmark case. However, the trial was post-*Miranda* whose safeguards were made applicable to all cases tried later. *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

■ It is also noted that the judge's charge on the issue of insanity was not complete in that he failed to charge that before the jury could find beyond a reasonable doubt that the defendant was sane at the time the crime was committed they must determine whether or not he was laboring under such a disease of the mind so "as not to know the nature and the quality

of the act he was doing." That is an integral part of the test laid down more than a century ago in *M'Naughten's Case* 10 Clark & F 200, 8 Eng. 718 (1843) which, at the present time, is the rule that must be applied in Tennessee. See *Edwards v. State*, 540 S.W.2d 641 (Tenn.1976) and *Spurlock v. State*, 212 Tenn. 132, 368 S.W.2d 299 (1963). *M'Naughten* has been widely criticized and even abandoned in many jurisdictions. It isn't much, but it is all we have to guide us in Tennessee, and it should be completely charged. It was not in this case.

We recognize that our decision leaves unresolved a major problem, the dilemma touched on at the outset that confronted the State when faced with the prospect of the holding in *Jackson* being applied to the defendant. This problem is akin to that discussed by Justice Henry, Justice Fones concurring, in the dissent in *Edwards*, supra:

> There is a glaring deficiency in Tennessee statutory law as it relates to the disposition of criminal defendants found not guilty by reason of insanity. All will agree that [such] a criminal defendant, acquitted by a jury, should not be released to return to society, and, I think all will agree that confinement in a penal institution is inappropriate restraint for the mentally ill. Our law gives the jury no alternative. Either it sends a mentally ill defendant to the penitentiary or it releases him upon society. Given this choice societal instincts of preservation demand confinement in the penitentiary.

The Law Revision Commission came to grips with this problem. § 40–2321, of its proposed criminal code, provides that in certain designated cases (including homicide), if a defendant is found guilty by reason of insanity:

> [T]he Court shall order him to be committed to the custody of the Commissioner of Mental Health to be placed in an appropriate institution for custody, care and treatment.

The Commission's comment under this proposed section reads, in pertinent part, as follows:

> *Tennessee is now the only state not having statutory procedures for the treatment of criminal defendants acquitted on the defense of insanity.* The resulting uncertainty as to the disposition of the incompetent offender has resulted in an unreasonable resistence to the proper use of the insanity defense in this state. (Emphasis supplied).

This proposed Code provision now pends before the Legislature. The adoption of some procedure for public disposition in such cases is a matter of urgent public concern. Tennessee desperately needs some mechanism for providing the public with protection and simultaneously insuring that the unfortunate victims of mental disease are dealt with in a humane manner. Their restoration to useful and productive citizenship is a matter of compelling state interest.

We feel safe in saying that, even though contained in a dissenting opinion, the above observations are universally approved by all concerned with the administration of criminal justice in Tennessee. The following commentary by Justice Henry was obviously not completely acceptable to the majority in *Edwards* under the facts of that case but well illustrates the necessity for remedial attention to the serious problem:

> Trial and appellate judges and jurors labor under the difficulty arising from the State's failure to act in this area of vital public concern. Twelve jurors and nine judges have now considered George Edward's case. I am persuaded that if they had a choice each of these twenty-one Tennesseans would say without a moment's hesitation that he should be placed in a mental institution for care and treatment. I believe all would agree that sending him to the penitentiary would be inhumane. Time was when the lame, the halt, the physical misfits and the mentally diseased were thrown over a cliff because they were a threat to the security of the group. George Edwards is such an outcast. We are throwing him over the cliff because there is a void in our law.

■ For even more compelling and additional reasons other than those dealt with in *Edwards*, we are impelled to the legal conclusion that the defendant should, and must, be released from all criminal restraint.

Accordingly, the judgement is reversed, and the prosecution is dismissed.

RUSSELL, Panel P. J., and DAUGHTREY, J., concur.