12 F.3d 211
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
John E. CARTER, Petitioner-Appellant,
v.
Neil RONE, Warden, Respondent-Appellee.
 No. 93-5499.
 United States Court of Appeals, Sixth Circuit.
 Dec. 2, 1993.
 
 On Appeal from the United States District Court for the Middle District of Tennessee, No. 90-00780; Morton, J.
 M.D.Tenn.
 AFFIRMED.
 Before: GUY and RYAN, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 John E. Carter appeals the denial of his pro se petition for habeas corpus. Carter is currently confined in Tennessee state prison following his 1982 conviction on two counts of first degree murder. Before this court, Carter claims he was denied the effective assistance of counsel, his confession to the murders was admitted into evidence in violation of his constitutional rights, and insufficient evidence existed that he was sane. We reject all of petitioner's arguments, and affirm the denial of his habeas corpus petition.
 
 I.
 
 2
 On June 28, 1981, John Henry Carter was found dead beside the steps of the front porch of his farm house in White County, Tennessee. The body of Carter's wife, Laura, was found in the house. The ensuing investigation resulted in the arrest of the dead couple's grandson, John E. Carter.
 
 
 3
 John E. Carter visited his grandparents occasionally on their Tennessee farm, and they attempted to keep in touch with him because his father was dead. The Carters apparently had a fairly normal relationship with their grandson, although they did disapprove of his relationship with a married woman. Friction was created when young John, who did not hold a job, financed his relationship with his girlfriend by forging checks from his grandfather's bank account and stealing from his grandmother's purse.
 
 
 4
 When young John visited his grandparents on Saturday, June 27, 1981, they confronted him with a forged check for $1,500. After his grandparents went to bed for the evening, John attempted to kill them. He took a firewood log into their bedroom and beat them in the head until they were unconscious. Then, to mask his act, John went downstairs and ransacked the house to give it the appearance that it had been robbed. While John was ransacking the house, his grandfather regained consciousness and began to flee the house, but John found his grandfather's pistol and shot at him as he ran past. The elderly Carter made it to the front porch before John shot and killed him. Then, John went back into the house and shot his grandmother three times in the face.
 
 
 5
 Around 9:00 the following night, the local district attorney and Agent Jim Moore of the Tennessee Bureau of Investigation received a call from John Carter, who had by then arrived at his family's home in Michigan. Carter said that he had left the area because on the night of the murders he had received death threats concerning a dope deal and his cohabitation with a married woman. Carter and Agent Moore discussed his return to Tennessee, but Carter said he feared for his life and therefore requested an escort from the Nashville airport to Sparta, Tennessee. Another officer agreed to meet Carter. When they arrived in Sparta, Agent Moore told Carter that he was not a suspect, but nevertheless read Carter his rights. Carter signed a waiver of his rights, and the interview began. Carter claimed that he took the 8:00 p.m. bus from Cookeville, Tennessee, to Nashville on Saturday, June 27, the day his grandparents were murdered. Moore had already shown the driver of the bus a photo of Carter, and the driver said that no one fitting Carter's description boarded the bus that night. Moore confronted Carter with this information, and Carter then said that he had intended to take the 8:00 p.m. bus, but before boarding he saw a man at the station who "looked suspicious." Thus, Carter stated that he had his grandparents take him to the local mall where he played pinball before taking the midnight bus to Nashville.
 
 
 6
 Other inconsistencies became evident, and when pressed, Carter again changed his story. He said that he did leave the bus station with his grandparents, but they all returned to the farm, not the mall. During the night, according to Carter, a man entered through the back door and put a gun to Carter's head. Agent Moore then pointed out that the back door was locked. Carter then became agitated, terminated the interview, and requested an attorney. Counsel was appointed for him. After consultation with his attorney, Carter submitted to a second interview with his attorney present. Carter gave a statement consistent with his latest account of events, but rather than describing a lone attacker Carter stated that four men had attacked during the night. According to Carter, the four men killed his grandparents, and he barely escaped with his life in his grandfather's truck. After the second interview, Carter was excused. Agent Moore investigated further, however, because of the inconsistencies in Carter's statements. This investigation revealed two checks totaling $1,800 and bearing the forged signature of John Henry Carter. In addition, Carter's married girlfriend told police that Carter had more than once mentioned killing his grandparents so he could inherit his share of their farm. The 120-acre farm was worth $1,200 to $1,500 per acre. On July 10, the White County grand jury returned an indictment against Carter.
 
 
 7
 Carter had returned to Michigan, and Agent Moore and another officer drove from Tennessee to Michigan to serve a capias for Carter's arrest. At the county jail, Moore again advised Carter of his rights and began to interview him. Carter asked to speak to his attorney, and Moore ceased questioning and permitted Carter to call his attorney. After finishing the call, Carter returned to the officers and told them that his attorney advised him to waive extradition. Moore then asked him if he wanted to make a statement, and Carter responded that he would think about it. Moore then continued to ask whether Carter wished to make a statement, but Carter would only respond that he wanted to think about it. After a short time, it became clear that Carter did not wish to talk, and Moore stopped questioning and placed him in a holding cell. The following day, the officers took Carter before a magistrate to advise him of his extradition rights. He waived extradition and they returned him to his cell for the night.
 
 
 8
 The next day, July 14, Carter and the officers began their trip back to Tennessee. Moore and the other officer were in the front seat, and Carter was in the back seat in handcuffs and shackles. There was very little conversation on the trip that day, though apparently Carter asked a few questions concerning insanity and possible psychiatric help and Moore again asked Carter whether he wished to make a statement. The trio arrived that evening in Georgetown, Kentucky, and Carter spent another night in jail. As they were placing him in the cell, Moore said: "Johnny, you're a young man. You need to get your life straightened out and get your things together, and let's get all this straightened out. You've got a long life ahead of you." (App. 64-65.)
 
 
 9
 The following morning, Moore greeted Carter by asking him how he had slept. Carter told the officers that he had been thinking about what Moore had said the previous evening, and he wanted to "get this thing cleared up." He had slept poorly, he said, as he considered Moore's statement. Moore advised Carter again of his rights, and Carter signed a waiver and began to answer questions. He made a lengthy confession, which Moore wrote down as they spoke. Carter then read the statement, made additions, and signed it. The confession read, in part:
 
 
 10
 On Sunday when I got to my aunt's house in Detroit they told me about my grandparents, and that's when I realized I had something to do with their death. The best I can remember now, I was standing over them swinging at them. I was mad, hurt, upset, heartbroken at the whole world. I felt like this [at] bedtime. The next thing I remember was the gun going off in the bathroom. I remember the gun going off three or four more times. I remember my grandfather laying off the porch in the front yard. I got in the truck. I remember throwing the gun off a bridge; I'm not sure which one. I was alone and nobody else was with me. I must have killed my grandparents. I was the only one there.
 
 
 11
 (App. 65.) Several weeks later, he made a separate confession to his girlfriend. It stated:
 
 
 12
 As you know, they said I killed my grandparents. You know, I'm beginning to believe them. You know, though, the only way I could have is if I lost control of myself like I've done before. I'm so sorry I can't stand it, even of things I might have said. I think you know I couldn't have done this knowing what I was doing.... Well, once I told them [about forging the $1500 check], they got pretty upset to say the least. They started to carry on all day. They just kept going on and on. I was really upset about lying to them and the checks, and most of all, losing you and the boys.... They just would not let it rest. Then they started in on about you and I couldn't take that. I rolled over and started yelling into my pillow. The next thing I remember is being in the parking lot of Burger King in Cookeville. I had blood on my arms and on my feet. I didn't know what I had done, so I started running. I caught the midnight bus to Nashville. When they told me someone had killed my grandparents I didn't want to believe them. That was the last thing I ever wanted to do.
 
 
 13
 (App. 69.)
 
 
 14
 Prior to trial, Carter moved to suppress statements he made, which the Tennessee state court denied. At trial Carter relied on an insanity defense. Carter was convicted of two counts of first degree murder, and was sentenced to two consecutive terms of life imprisonment. The Tennessee Court of Criminal Appeals affirmed the convictions. At that time, Carter did not apply for permission to appeal to the Tennessee Supreme Court. In 1988, Carter filed a petition for post-conviction relief in the state trial court. This petition was denied, and the Court of Criminal Appeals affirmed the denial. During post-conviction relief proceedings, however, Carter alleged as part of an ineffective assistance of counsel claim that the failure to apply for permission to appeal was the result of neglect by his attorney. The Tennessee Court of Criminal Appeals vacated and re-entered its earlier affirmance in order to reopen Carter's time to appeal the judgment. The Tennessee Supreme Court denied Carter's application for permission to appeal. Carter then sought relief in federal district court, but that court also denied his petition and this appeal followed.
 
 II.
 A. Ineffective Assistance of Counsel Claim
 
 15
 Carter alleges that he was denied his Sixth Amendment right to the effective assistance of counsel when his trial attorney failed to preserve for appeal the issue of the admissibility of his confession. On direct appeal, the Tennessee Court of Criminal Appeals held the issue waived for it found that the issue had not been raised in a motion for new trial nor was a proper transcript of the suppression hearing or the order denying suppression included in the record on appeal. In rejecting Carter's ineffective assistance claim, the district court concluded that a rational jury could easily have found Carter guilty beyond a reasonable doubt even without evidence of Carter's confession. Thus, according to the district court, any counsel error in failing to preserve the issue on appeal was harmless, though the court was unwilling to conclude that Carter's attorney did commit error.
 
 
 16
 Our analysis of Carter's ineffective assistance of counsel claim is guided by Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court established a two part inquiry:
 
 
 17
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
 
 
 18
 Id. at 687. In determining whether an attorney's conduct was deficient, the proper standard for attorney performance "is that of reasonably effective assistance," id., "viewed as of the time of counsel's conduct [and considered] in light of all the circumstances." Id. at 690. We must be "highly deferential" in our scrutiny of counsel's performance. Id. at 689. Thus, a petitioner must overcome the presumption that, under the circumstances, "the challenged action 'might be considered sound trial strategy.' " Id. (citation omitted). If the presumption is overcome and counsel's conduct is indeed deficient, the petitioner must still demonstrate that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. Id. at 694.
 
 
 19
 Carter's claim fails both elements of the Strickland analysis. As the district court noted, Carter's trial attorney may have failed to preserve the suppression issue for appeal based on his "reasoned understanding" of Tennessee law regarding suppression of confessions and appellate review. At the suppression hearing, the state trial judge stated clearly that he believed the government's version of the facts surrounding the confession, and therefore found no violation of Carter's constitutional rights. On appeal in Tennessee state court, such a finding of fact is presumptively correct. See State v. Morgan, 825 S.W.2d 113, 116 (Tenn.Cr.App.1991). Thus, Carter's attorney may well have decided not to press an argument on appeal that he considered unpersuasive.
 
 
 20
 Even if Carter's attorney erred in failing to preserve the confession issue, Carter has failed to demonstrate that his counsel's alleged error prejudiced his defense. There is not a reasonable probability that the jury would have reached a different result had it not heard evidence of Carter's confession, for substantial evidence of Carter's guilt existed aside from that confession. In interviews with police officers prior to his indictment, the constitutionality of which Carter does not challenge, Carter gave wildly conflicting accounts of the events surrounding the murders. In his final version of events, Carter stated four men killed his grandparents, but he fled the scene without alerting police of the attack. In addition, the state offered evidence that Carter had forged several checks, had stolen money from his grandmother's purse, and was an heir to the farm. Clearly, Carter had a motive to commit the crime, and the state also proved that Carter had the opportunity to commit the murders because he was at the farm around the time the murders were committed. Carter's girlfriend, Debbie Smith, testified that Carter had on several occasions said how easy it would be to kill his grandparents to inherit the farm, and she also told of Carter's violent disposition. Finally, Carter's letter to Smith was admitted as evidence at trial, and the letter very much resembles a confession. Thus, while not conceding that Carter's confession argument has merit, we fail to see how the outcome would have changed if the trial court had deemed Carter's confession inadmissible.
 
 
 21
 B. Carter's Motion to Suppress his Confession
 
 
 22
 Carter next complains that the admission of his confession at trial violated his constitutional rights. Specifically, he claims that his confession was coerced because questioning persisted after he refused to make statements and requested counsel. In addition, Carter asserts that his confession was obtained in violation of his Sixth Amendment right to counsel, for he made statements to police officers after his indictment outside the presence of counsel. In response, the state argues that review of these issues is barred by Carter's procedural default, but the state also contends that Carter's substantive arguments are meritless.
 
 
 23
 We need not engage in what we have previously described as the "complicated analysis" of the state's procedural bar claim for two reasons. Maupin v. Smith, 785 F.2d 135, 138 (6th Cir.1986). First, as we explained previously, substantial evidence existed to prove Carter's guilt beyond a reasonable doubt without admission of his post-indictment confession. Thus, any constitutional error that occurred at trial did not have a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 113 S.Ct. 1710, 1721-22 (1993) (rejecting application of the "harmless beyond a reasonable doubt" harmless error standard enunciated in Chapman v. California, 386 U.S. 18, 24 (1966), to habeas corpus cases). Second, we agree with the government that the trial court did not err in allowing admission of Carter's post-indictment confession.
 
 
 24
 Carter claimed that he confessed to the murders after spending a night alone in his jail cell thinking about Agent Moore's statement to "get this straightened out." That morning, Carter told Moore that he would answer questions. Moore then read him his rights, asked Carter a few questions, and Carter began a narrative that Moore transcribed. Carter then read the statement, made additions, and signed it. Viewing all the circumstances, we believe Carter voluntarily gave his confession. Agent Moore made his statement to Carter while ushering Carter into his jail cell for the evening. While Carter was certainly in custody at the time, Moore's statements cannot be considered interrogation. See Miranda v. Arizona, 384 U.S. 436 (1966) (Miranda warnings apply during custodial interrogation). Interrogation exists only when a person in custody is subjected either to express questioning or its "functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980). The functional equivalent of interrogation includes "any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Id. at 301. Clearly, Moore was not questioning Carter. Nor do we think that Carter was subjected to the functional equivalent of questioning when Moore made his statement while escorting Carter to his jail cell for the evening. Moore did not invite a response from Carter, but instead made a remark knowing that Carter had repeatedly indicated that he was thinking of making a statement.
 
 
 25
 Carter also claimed that he had a Sixth Amendment right to have counsel present during interrogation, because judicial proceedings had been initiated against him. See Kirby v. Illinois, 406 U.S. 682, 688 (1972). It is not clear from the record that this argument has ever been raised previously, but we need not rely on Carter's waiver of the issue below in rejecting his claim. As we have indicated above, no interrogation of Carter occurred until he awoke on July 15 and told officers that he wanted to straighten things out. Thus, it was Carter that instigated the discussion, and only then did Agent Moore read him his rights and begin the conversation that resulted in Carter's confession. By initiating the conversation that morning and by receiving his Miranda warnings, Carter waived his Sixth Amendment right to counsel. See Patterson v. Illinois, 487 U.S. 285, 292-93 (1988) (defendant can waive his Sixth Amendment right to counsel, particularly when defendant admonished with Miranda warnings).
 
 
 26
 C. Sufficiency of the Evidence Regarding Carter's Sanity
 
 
 27
 In his final challenge, Carter asserts that the weight of the psychological evidence offered at trial proved that Carter was insane at the time of the crime. Specifically, Carter challenges as "equivocal" the testimony of one of the state's witnesses regarding insanity. In addition, Carter argues that the trial court erred in allowing the testimony of a nurse, whose testimony included mention of Carter's statement that his lawyer "told him to play crazy."
 
 
 28
 Under Tennessee law, when there is evidence pro and con on the issue of the sanity of the person charged with a crime, the state bears the burden of proving that the defendant had the mental ability to distinguish between right and wrong, and knew the nature and quality of his act at the time of the act. Edwards v. State, 540 S.W.2d 641, 646 (Tenn.1976), cert. denied, 429 U.S. 1061 (1977). The state may meet its burden with expert testimony, lay testimony, or by proof of acts or statements by the defendant that are consistent with sanity or inconsistent with insanity. Id. The issue of sanity is a question for the jury. Graham v. State, 547 S.W.2d 531, 543 (Tenn.1977).
 
 
 29
 In this habeas appeal, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Carter sane. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). We find that significant evidence existed to establish Carter's sanity. The Tennessee Court of Criminal Appeals considered this argument and held that the state introduced expert psychiatric testimony to the effect that Carter was competent both at the time of the homicides and on the date of the trial. This evidence was buttressed by lay testimony from others regarding Carter's actions during the time of the murders.
 
 
 30
 Moreover, a nurse who served as the coordinator of Carter's evaluation team during his court-ordered 30-day evaluation at the Middle Tennessee Mental Health Institute testified that Carter told her of his lawyer's recommendation "to play crazy." Carter admits that the nurse's testimony is inconsistent with his claim of insanity, but Carter argues that her testimony was inadmissible because she was not an expert and because her testimony was introduced "for the sole purpose of prejudicing the jury against the defendant." Clearly, the nurse's testimony was admissible, for both experts and lay witnesses can testify as to insanity in Tennessee. See Edwards, 540 S.W.2d at 646 (admissible evidence includes both "medical and lay" testimony). Thus, we need not reach Carter's claim that the nurse was improperly treated as an expert, though evidence established that she could have been qualified as such. Carter's prejudice argument is similarly unavailing, for the nurse's testimony was directly relevant to the question of Carter's sanity. Any prejudice to Carter's insanity defense was the result of the highly damaging statement he himself made to the nurse. In sum, we hold that sufficient evidence existed for a rational juror to conclude that Carter was sane at all relevant times.
 
 
 31
 AFFIRMED.