Bobby Essary et al.

*v.*

State of Tennessee.

357 S.W.2d 342.

(*Jackson,* April Term, 1962.)

Opinion filed May 4, 1962.

GEORGE MORRISON, Jackson, for plaintiffs in error.

GEORGE F. MCCANLESS, Attorney General, WALKER T. TIPTON, Assistant Attorney General, Nashville, for the State.

Mr. Justice White delivered the opinion of the Court.

The defendant, Bobby Essary, and others as plaintiffs-in-error, defendants below, have been tried, convicted and a fine of $50.00 each has been assessed against them by the jury and approved by the Trial Court for violating Section 39-2805, T.C.A., which section is as follows:

"Any person or persons who shall willfully prowl or travel or ride or walk through the country or towns, to the disturbance of the peace or to the alarming of the citizens of any portion of the state, or for the purpose of damaging or destroying property, or for the purpose of intimidating or terrorizing any citizen or citizens of this state, or for the purpose of causing, through threats or intimidation or other improper means, any citizen or citizens of this state to do or not to do any lawful thing or to do any unlawful thing, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than fifty dollars ($50.00) nor more than one hundred dollars. ($100), and imprisoned in the county jail for not less than six (6) months nor more than twelve (12) months, said imprisonment to be within the discretion of the judge trying the case."

They have appealed and assigned errors.

The record reveals that Paul Griffith and the several defendants were all employees of the same Company

located in or near the City of Dresden, Tennessee. Paul Griffith was employed in a particular part of the plant and he considered that his particular job was essential to the production of certain types or kinds of shoes being manufactured by the Company. At any rate, he refused to leave his job as requested by the defendants herein. They wanted him to do so in order that they might present a more solid front to the employer to secure certain benefits to which they felt they were justly entitled.

At about 4:00 o'clock on the afternoon of the 30th day of March, 1961, these defendants decided to go to the home of Paul Griffith in an effort to persuade him to join with them in their demands against said employer. These defendants got in three separate automobiles and two of these cars proceeded down the highway from Dresden on the road to Paul Griffith's home. At a point these two cars stopped on opposite sides of the road facing the highway in such a manner that some one approaching from the direction of the factory would not see them. The other car remained in town near the factory.

A Mrs. Myrtle Rogers, an aunt of Paul Griffith, came down this same highway from the opposite direction and saw the two cars parked back off of the road as aforesaid. She recognized two of the defendants as being occupants of one of the cars. Her interest became aroused when she saw these two automobiles so parked and when she recognized two of the occupants. She then turned her automobile around and drove back to the point where the cars were parked. After observing more thoroughly, she then drove toward Latham, Tennessee, a community in which she and Paul Griffith lived. As she drove away

the two cars pulled out from their parked positions and followed her. It also appears from the proof that the third carload of defendants caught up with all of them at about this time. It might be observed that Paul Griffith left his work at about 4:30 o'clock on this same afternoon.

The three automobiles occupied by these defendants then proceeded to the home of Paul Griffith, but since they did not see his truck they went on through the small town of Latham and drove by the home of Charles Griffith, the brother of Paul Griffith. Charles Griffith was standing in a lot next to his house. According to the proof, one of the defendants made some threatening remarks to Charles Griffith about his brother, Paul, to the effect that "if you think anything of that brother of yours you had better get him out the plant". After this they drove off toward Paul Griffith's home again. They were followed by Charles Griffith. He proceeded about two miles down the road when he found the road blocked by the defendants' automobiles and about eight or ten of the defendants were standing in the road in front of him. After some words were exchanged with these defendants, or some of them, he, Charles Griffith, reversed his automobile and drove to the home of a friend and phoned the Sheriff and told him that he thought there was going to be some trouble at the Paul Griffith home.

In the meantime, these defendants had proceeded to the home of Paul Griffith who testified that he had been to his home and was about to leave again and had the truck door open trying to get in and leave when the three cars loaded with the defendants appeared at his driveway and stopped. Most of them got out while others

remained in the cars. The conversation then went on between the prosecutor and the defendants during which time they were making an effort to induce him to join them. When he refused Griffith testified that ''they said they was going to bring me out of there if they had to bring me feet first''. He identified Bill Rainey, one of the defendants, as having said that. Griffith then asked if they were going to kill him and Rainey said he didn't say that they were going to do that but we ''are going to take you out even though we have to take you out feet first''. The reply of Griffith was ''That's the only way you are going to get me out is to take me out feet first.'' At that time the prosecutor was talking primarily with Mr. Rainey but he says that some of the other defendants said ''Yes Paul we are going to get you out of there''.

The prosecutor testified that ten or fifteen of the defendants were talking at the same time. Every one telling him what he (one of the defendants) was going to do to me. The prosecutor was asked to describe to the jury the type of language used there in front of his home on the afternoon of March 30 when the defendants came to see him.

We find it unnecessary to quote this language in this opinion, but the record reveals that such language was opprobrious, degrading and highly inflammatory, and which ordinarily precedes physical difficulty and combat between men. These curse words were used in the presence of Myrtle Rogers, her sixteen year old son, Kenneth, his brother, Charles Griffith, and possibly others. On cross-examination he testified that the defendant, Summers, said:—''Well we're going to get you, that's right.''

Two of the female defendants used profane language directed to Myrtle Rogers, according to her testimony, which language it is not necessary to express in this opinion, and invited her to come out into the roadway, which she refused to do. These two, or one of them, said ''we wasn't after you, we were after your nephew''. (Paul Griffith). ''We will get you tomorrow''.

Herbert Tuck, a police officer, said that when he arrived at the scene he heard all of them cursing.

Mrs. Paul Griffith says that she heard some of the defendants say that they would get Paul Griffith, and heard the women curse Myrtle Rogers.

Paul Griffith, his wife, his brother, Charles Griffith, and his aunt, Myrtle Rogers all testify that the defendants were screaming, cursing, shaking their fists, their hair was disheveled and they were acting like an unruly mob on television.

The difficulty between this prosecutor and these defendants had been building over a period of several days, if not weeks, and the reason for the delay of Griffith's arrival at home at the usual time was the fact that he went by his father's home to get a shotgun because he, Griffith, was ''getting mad''.

Thereafter, the defendants were indicted, tried and convicted as aforesaid.

One of the assignments of error is that the preponderance of the evidence is against the verdict of the jury and in favor of the innocence of the defendants. In considering this assignment we must apply the rule that has been established over a period of many years that the credibility of the witnesses and the conflicts in

their testimony have been settled by the verdict of the jury which has been approved by the Trial Court.

■ This Court has on many occasions adopted the language of the Court in the case of *Cooper v. State,* 123 Tenn. 37, 138 S.W. 826, and we now adopt it again, the same appearing in the headnote on page 37 as follows:

"A verdict of guilty in a criminal case, approved by the trial judge, removes the presumption of innocence, and raises a presumption of guilt, which the accused must overcome upon the record, in order to obtain a reversal on the facts; and such verdict will not be disturbed upon the facts by the supreme court unless, upon an examination of the whole record, there is found to be a clear preponderance of the evidence in favor of the innocence of such convicted prisoner."

To the same effect is the holding in the case of *Anderson v. State,* 207 Tenn. 486, 341 S.W.2d 385, which was an opinion delivered by Mr. Justice Felts for the Court.

The defendants in their brief rely upon, to some extent, the case of *DeBoard v. State,* 160 Tenn. 51, 22 S.W.2d 235. The facts in that case are that the defendant, DeBoard, was indicted under Chapter 427 of the Public Acts of 1907, now Section 39-2805, T.C.A. In that case the defendant was charged with trespassing upon the home of C. B. Tarwater and secretly looking in the windows of his home and the homes of other citizens in the nighttime with the intent and for the purpose of seeing and viewing women while they were undressing, thereby alarming, terrorizing the citizens and disturbing the peace of the town and the county. A motion to quash the indictment was overruled by the Trial Court but sustained by

this Court in the opinion written by Mr. Chief Justice Green. In that case the Court said:

"The intent having been to do the thing secretly, there could have been no intent to disturb or alarm. An act, secret and unknown, would not tend to the disturbance of the peace and alarming of the citizens."

In the case of *State ex rel. Thompson v. Reichman,* 135 Tenn. 653, 188 S.W. 225, to which the Court referred in the DeBoard case, the Court in defining what constitutes breach of peace said:

"The term, 'breach of the peace' is generic, and includes riotous and unlawful assemblies, riots, forcible entry and detainer, the sending of challenges and provoking to fight, going around in public, without lawful occasion, in such manner as to alarm the public, the wanton discharge of firearms in the public streets, *engaging in an affray or assault, using profane, indecent, and abusive language by one toward another, on a street and in the presence of others,* or being intoxicated and yelling on the public streets in such manner as to disturb the good order and tranquility of the neighborhood." (Emphasis supplied.)

The record in this case is abundantly replete with testimony that these defendants or one or all of them in concert did disturb the peace by cursing and abusing the prosecutor and by threatening him, all for the purpose of intimidating him or causing him to do their bidding.

As set out above, these defendants have been found guilty of violating the statute aforesaid by a jury composed of their neighbors.

The Court charged the jury in part:

"The proof must convince you beyond a reasonable doubt that the defendants drove to the prosecutor's home, arriving there at the same time and assembled there for the unlawful and collective purpose of forcing the prosecutor, Paul Griffith, through threats of violence and the use of angry and abusive language and by intimidating him, and through fear or force coerce him to unwillingly quit working * * *. If you find the defendants did collectively appear at the prosecutor's home or at the time on a friendly mission, in good humor, seeking to be friendly, seeking by friendly talks and persuasion or discussion to persuade the prosecutor to consider their views, without any purpose of intending harm, nor to threaten, nor to terrorize, nor to intimidate him, they would not be guilty of violating this statute. All persons present, aiding and abetting, or ready and consenting to aid and abet in any criminal offense shall be deemed principal offenders and punishable as such. Mere presence, however, would not make one a principal. He or she must either aid or abet or be ready and willing to aid and abet in the commission of the offense."

Section 39-109, T.C.A. provides:

"All persons present, aiding and abetting, or ready and consenting to aid and abet, in any criminal offense, shall be deemed principal offenders, and punished as such."

■ Since the jury found all of these defendants guilty beyond a reasonable doubt, we are not disposed to disturb such finding in view of the preponderance of the evidence showing the defendants to be guilty as charged.

■ The defendants assign as error the refusal of the Trial Judge to grant a severance of this case. There is no authority of law cited in support of such alleged error.

The evidence shows that these defendants were on a joint venture for the purposes as set out hereinabove and, therefore, the acts of one were the acts of all of them. Therefore, the jury could and did pass upon the guilt or innocence of each of the defendants fairly and impartially.

In the case of *Turner et al. v. State*, 187 Tenn. 309, 316, 213 S.W.2d 281, the Court, in passing upon the question of whether the action of the Trial Judge in refusing a severance resulted in prejudice to the defendant, said:

"It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the persons accused, is entitled to have its rights protected, and, when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants."

■ It is our opinion from an examination of this record that the rights of these defendants were not prejudiced as a result of the refusal of the Trial Court to grant a severance. The question of the granting or the refusing to grant severance is a matter of discretion with the Trial Court and unless that discretion is abused the action of the Trial Court will not be disturbed on appeal.

■ The third assignment of error is overruled for the reason that the testimony objected to was introduced primarily for the purpose of impeaching the testimony of the defendant, Summers. The admission of evidence in rebuttal is a matter of discretion with the Trial Court and unless the facts indicate that such discretion is abused his action will not be disturbed. We find in this case from the proof that the discretion of the Trial Judge was not abused in admitting said rebuttal testimony.

■ In the fourth assignment of error the defendants allege that the Trial Judge repeatedly allowed the State to offer proof about some rocks having been thrown at the prosecutor's house on the night before all of the defendants visited the home of the prosecutor. The bill of exceptions shows that the Trial Judge sustained each and every objection made by the defendants to any offer of proof in regard to this occurrence. Therefore, this assignment is overruled.

■ The fifth assignment of error is to the effect that the special prosecutor in the case was guilty of making improper and inflammatory statements to the jury to the prejudice of these defendants.

We have carefully gone over the statements made by such prosecutor, and we do not find anything improper or inflammatory in his remarks to the jury since he was merely stating to the jury his own conclusions about what might happen if these defendants were released. The jury assessed the minimum penalty, which shows that the words of the special prosecutor were not inflammatory or prejudicial to the rights of these defendants. The record shows, however, that upon objection

by one of the attorneys for the defendants the Court stated:

"Mr. Strawbridge, I believe I'll sustain the exception." To which Mr. Strawbridge replied: "Exception to what?" *"THE COURT*: As to the economic effect. It's a question of guilt or innocence." *"THE COURT*: I believe it's a little bit—getting a little bit far." *"MR. STRAWBRIDGE*: May it please the Court, would I be permitted to say, that if this isn't stopped that it will be rough in Weakley County. I've heard that said about a lot of other cases. *THE COURT*: Well if these men are guilty in it. *MR. STRAWBRIDGE*: Well that's what I'm talking about. I asked them not to treat it lightly." Mr. Strawbridge then continued his argument without more being said by any counsel of record.

The Trial Judge sustained the objection of counsel for the defendants to the argument of the special prosecutor all in the presence of the jury, but complaint is made that the Judge should have instructed the jury to disregard such argument. The defendants did not make such request of the Trial Judge at the time.

As indicated above, the argument evidently had no effect on the verdict of the jury since it assessed the minimum penalty only. Therefore, this assignment of error is overruled.

We have carefully considered this entire record, and we have concluded that these defendants have had a fair and impartial trial and that the verdict of the jury is in full accord with the law and the facts. Therefore, all assignments of error are overruled and the verdict of the jury and the action of the Trial Court thereon are in all things affirmed.