# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
## APRIL SESSION, 1997

STATE OF TENNESSEE,
    Appellee

vs.

WOODY J. DOZIER,
    Appellant

)
)
)
)
)
)
)
)
)
)

No. 02C01-9610-CC-00357

DYER COUNTY

Hon. **J. STEVEN STAFFORD**, Judge

(Aggravated Rape;
 Aggravated Kidnapping)

**FILED**

November 4, 1997

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

For the Appellant:

**JOE H. BYRD, JR.**
Shannon Professional Bldg.
203 S. Shannon St., Suite 300
P. O. Box 2764
Jackson, TN  38302-2764

For the Appellee:

**CHARLES W. BURSON**
Attorney General and Reporter

**ELIZABETH T. RYAN**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493


**C. PHILLIP BIVENS**
District Attorney General
P. O. Box E
Dyersburg, TN  38025

OPINION FILED: _____

AFFIRMED


**David G. Hayes**
Judge

**OPINION**

The appellant, Woody J. Dozier, appeals his jury convictions for the crimes of aggravated kidnapping and aggravated rape. Following these convictions, the Circuit Court of Dyer County sentenced the appellant to concurrent sentences of eight years for the aggravated kidnapping conviction and fifteen years for the aggravated rape conviction. On appeal, the appellant raises the following issues:

I. Whether the Chancellor, sitting by interchange, had jurisdiction to try the case;

II. Whether the appellant is entitled to a new trial because of alleged juror misconduct; and

III. Whether the evidence is sufficient to sustain his convictions for aggravated rape and aggravated kidnapping.

After reviewing the record before us, we affirm the judgment of the trial court.

**I. Background**

The proof, as developed at trial, revealed that the victim of this offense, Brenda Noel, was forty-one years old and resided in the Roellen community of Dyer County.[1] On Thursday, November 1, 1994, Ms. Noel visited her boyfriend, Jack Stewart, who lived in Dyersburg. She took a taxi to her friend's home, arriving between 8:00 and 9:00 p.m. She stayed only a short time and decided to leave. Without return cab fare, she began walking home, a distance of approximately five miles. While still inside the city limits of Dyersburg, Ms. Noel tried to obtain a ride by hitchhiking. She testified that a small blue two door car

---

[1]The appellant was unemployed but had been receiving disability benefits for "nerve problems" for some period of time.

2

passed her, turned around, and pulled into the V.F.W. parking lot across the street from her. In addition to the driver, the vehicle was occupied by a male passenger. The victim approached the vehicle and the driver of the car offered to take her home. Ms. Noel got into the back seat of the car.

Although the driver initially proceeded toward Roellen, he changed directions and turned onto a gravel road. At this point, Ms. Noel stated that she wanted out of the car, but the driver began to threaten her with physical harm. Meanwhile, the passenger in the front seat was "talking nasty to [Noel]." He asked her if she was married, if she had any children, and "what kind of sex did [she] have with her boyfriend." She responded that she did not want to talk about those things, but the passenger continued. Ms. Noel testified that the driver and his passenger were smoking a marijuana cigarette.

The driver stopped the car in a remote area and got out to use the bathroom. Upon his return, he climbed into the backseat with Ms. Noel and told the passenger to get out of the car. He then informed Ms. Noel, "[w]e're fixing to have sex." While she protested his actions, the driver removed a blue condom from Ms. Noel's purse. The driver began removing Ms. Noel's clothes. She repeatedly told him to get off of her. Ignoring the victim's pleas, the appellant then sexually penetrated her.

After raping the victim, the appellant went to the back of the vehicle and asked his passenger to join him. While both were at the rear of the vehicle, the hatch was opened. Ms. Noel testified that she heard the appellant and the passenger discuss killing her. She then heard the passenger state that he was going to get his gun and "shoot the cow." No weapon, however, was ever observed by the victim. At this point, Ms. Noel thought she was going to die. The two men returned to the car. The driver told Ms. Noel, "I raped you. Want

3

some more?" to which Ms. Noel replied "Leave me alone.  I said take me home or put me out and I'll walk home."  The driver drove his victim to Roellen and released her at the Farmers Supply Store, which was within walking distance of her home.[2]  Ms. Noel hid behind the store until the car left and then walked home.[3]  Shortly after reaching her home, the victim contacted law enforcement officials and agreed to meet them at the Farmer's Supply Store.[4]

Dyer County Deputy Mike Winchester was the first to arrive at the store. Ms. Noel told the deputy that she had been raped and provided descriptions of her assailants and the vehicle.  Specifically, she described the driver as having "long hair, a beard and a little goatee.  He was a little bit heavy and his hair was slicked back."  The passenger had black hair and a little moustache.  She described the vehicle as being a small blue two door car.  She stated that the black plastic tip from the cigarette lighter was missing, that the car had a digital dashboard display, that the interior light was not functioning, and that the car had a luggage rack.  Deputy Winchester then transported Ms. Noel to the hospital.

Calvin Johnson, a criminal investigator with the Dyer County Sheriff's Department, met Ms. Noel at the hospital.  After interviewing Ms. Noel, Johnson, along with Ms. Noel and Deputy McCreight, returned to the scene where the rape occurred.  Johnson recovered a used blue condom and its wrapper.  He photographed the area, including tire tracks.  He also made a plaster casting of the tire track.

Upon returning to the sheriff's office, Ms. Noel was shown a photographic

---

[2]The victim testified that, after being let out of the vehicle, "[the perpetrators] went . . .towards Newbern."

[3]Noel testified that, on her walk home, she passed Hilltop Grocery which was closed.  She added that the store normally closed at 10:00 p.m.

[4]Connie Crawford, the dispatcher on duty on the date at issue, testified that Ms. Noel reported the incident at 12:04 a.m.

array of individuals who fit the description she had given to the sheriff's department. Without hesitation, she identified the appellant and the passenger as her assailants. The passenger was identified as John Turner, who was indicted as a co-defendant in this case. The appellant and John Turner are cousins. Again, at trial, the victim identified the appellant as the person who raped her and she identified Turner as his accomplice.

At approximately 12:30 a.m., Officer Bennie Green, a sergeant with the Newbern Police Department, observed a 1990 blue Mustang with a luggage rack[5] turn onto the parking lot of a convenience store at 117 South Main Street in Newbern.[6] The driver got out of the vehicle and made a telephone call. He described the driver as being a "pretty good size fellow" with long black hair. At the convenience store, Officer Green spoke with David Neil, the clerk on duty. Neil explained that he did not know the names of the two men in the blue Mustang, but that they were regular customers. At trial, Neil identified the appellant and his co-defendant as the driver and passenger of the Mustang.

Margaret Bash, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory specializing in DNA analysis and serology, testified that she was requested by the Dyer County Sheriff's Department to perform an analysis of (1) a blood sample from Ms. Noel, (2) vaginal slides and swabs, and (3) a blue condom. She explained that she found spermatozoa on the slides obtained from the vaginal swabs, although she could not pinpoint the time of intercourse, because spermatozoa can survive up to five days after intercourse.[7] She also found spermatozoa from slides produced from the

---

[5]At trial, Green explained that what he had described as a luggage rack was actually a spoiler.

[6]Although Newbern is also located in Dyer County, the record does not reflect the distance between the Farmer's Supply Store in the Roellen community and Newbern.

[7]The victim testified that she had intercourse with her boyfriend on the Saturday preceding the rape.

condom. Bash further testified that, although she was able to extract DNA from Ms. Noel's blood sample and the vaginal swabs, she was unable to obtain a viable sample from the condom, because it was contaminated with "a lot of gritty, dusty, red clay," which had caused the sample to degrade. On February 6, 1995, Bash received a blood sample from the appellant from which she was able to extract DNA. She testified that the appellant's DNA and the DNA recovered from the vaginal swabs did not match.

Neither the appellant nor his co-defendant testified at trial. Both relied upon the defense of alibi. In establishing this defense, the appellant presented numerous witnesses covering the time frame of 9:00 p.m. on November 1, until 12:45 a.m. on November 2. Charles Preston Turner, the appellant's cousin, testified that on the evening of November 1, 1994, the appellant and his co-defendant were at his home from about 9:00 p.m. to about 10:00 p.m. His wife, Tonya Turner, confirmed this statement. Stacy Permenter, a friend of the appellant's and also an employee of the City Cafe in Newbern, testified that, on November 1, 1994, she recalled seeing the appellant and Turner leaving the restaurant at approximately 10:20 p.m. Jackie Dale Bargery, a Ridgely Police Officer, testified that, on November 1, 1994, he observed the appellant and Turner sitting in the appellant's blue Mustang near Betty Ann's Pool Room in Ridgely at approximately 10:45 p.m.[8] Bargery also testified that later that evening he assisted in the search of the appellant's vehicle. He stated that no Harley-Davidson cigarette butt was found inside the car.[9]

Shirley Epperson, a bartender at Bruce's Place in Ridgely, testified that, on November 1, 1994, the appellant and the co-defendant were at the bar from

---

[8]Although we take judicial notice that Ridgely is located in Lake County, again, the record fails to establish the distance or particular route traveled between Newbern and Ridgely.

[9]On cross-examination, Ms. Noel admitted that she had smoked a cigarette while in the car. She stated, however, that the co-defendant had disposed of the cigarette butt by throwing it out of the car window.

10:55 p.m. until 11:55 p.m. Keith Goodman and Donnie York confirmed their presence at Bruce's Place. Both Goodman and York stated that, after leaving Bruce's Place, the foursome proceeded to the Gratio Road to drag race. They explained that the drive shaft of York's 1989 Silverado fell out and that York had to drive back to town on his three wheeler, while the appellant followed behind, providing lights. York and Goodman stated that they arrived back in town about 12:45 a.m. Hazel Tippet, a resident of Gratio Road, testified that, at 12:28 a.m. on November 1, 1994, she heard drag racing on the road in front of her home, "and then it sounded like they got in a ditch - the motor was revving." She explained that she looked out her window, observed two vehicles, then went back to bed. She stated, however, that she did not observe a vehicle outside the next morning.

Marvin Robinson testified that he inspected the appellant's Mustang impounded at the Sheriff's Department. He stated that the dome light worked; that the dash panel had needle instrumentation, not digital, although the stereo had a digital display; that the cigarette lighter was intact but did not heat; that the brake lights did not work; that the driver side seat was broken; that the vehicle cannot start without depressing the clutch; and that the hatch cannot be opened from the back, rather, the trunk release in the glove box must be pushed. Reverend Charles Runions testified that he had sold the 1990 Mustang to the appellant. He explained that there was no key to the rear hatch of the car. He stated that the key must be in the ignition and the trunk release button must be depressed in order to open the rear hatch of the car.

Sandy Evans, a forensic scientist for the Tennessee Bureau of Investigation, testified that she performed a comparison analysis of the tire tracks taken at the crime scene with those from the appellant's vehicle. Her testing revealed the photograph of the track and the plaster cast thereof to be

7

inconsistent with respect to the tread design of each of the rear tires of the appellant's vehicle.  However, a comparison of the front tires revealed consistent size and tread design.  No further distinguishing characteristics were observed.

Based upon this evidence, the jury found the appellant guilty of aggravated kidnapping and aggravated rape.

## II.  Judge by Interchange

On October 31, 1995, the Honorable Joe G. Riley, Circuit Judge of the Twenty-Ninth Judicial District, entered an order appointing the Honorable J. Steven Stafford, Chancellor of the Twenty-Ninth Judicial District, to sit by interchange in the present case, because Judge Riley was scheduled for another jury trial the same day.  Prior to commencement of the trial, the appellant filed a "Motion for Disqualification of Chancellor by Interchange to Preside over Jury Trial of Felony Charges."  This motion was denied.  On appeal, the appellant contends that Chancellor Stafford, who presided over the trial of this case was without authority to preside over a criminal case in the circuit court for the Twenty-Ninth Judicial District.  Specifically, he argues that a chancellor may interchange with a judge of the circuit court only when the circuit judge is incompetent to try the pending case.

The appellant cites as authority for his position the following three statutes dealing with the issue of interchange.  Although in force on the date this case was tried, these statutes have since been repealed.[10]  Accordingly, after June 13,

---

[10]Effective June 13, 1997, Sections 17-2-201, -202, -203, -204, and -205, were repealed. These collective provisions were replaced by Sections 17-2-201 and 17-2-202.  Section 17-2-201 now provides:

> The purpose of this act is to insure that existing judicial resources are utilized to the fullest extent and that no additional judicial resources are created until uniform caseload statistics are developed which will establish a priority for the

1997, any similar argument is moot.

> **§ 17-2-201. Interchange by circuit judges**. --The circuit judges may interchange with each other or with judges of special courts . . .when causes exist making an interchange <u>necessary</u>, or for <u>mutual convenience</u>. . . .

Tenn. Code Ann. § 17-2-201(1994)(repealed and replaced June 13, 1997) (emphasis added).

> **§ 17-2-202. Duty to interchange.** -- Where a judge is <u>incompetent</u>[11] to try any cause pending in the judge's circuit . . .it shall be the <u>positive</u> duty of the circuit court judge of any adjoining circuit. . .to interchange with such incompetent judge.

Tenn. Code Ann. § 17-2-202 (1994)(repealed and replaced June 13, 1997) (emphasis added).

> **§ 17-2-203. Interchange by chancellors**. Chancellors may also interchange with each other, and with judges of the circuit, criminal, or other special courts, under the same circumstances and to the same extent as enumerated in <u>§ 17-2-202.</u>

Tenn. Code Ann. § 17-2-203 (repealed June 13, 1997) (emphasis added).

The appellant argues that Tenn. Code Ann. § 17-2-201 permits circuit judges to interchange only with other circuit judges, <u>not</u> with chancellors. The

---

need for additional judges.

Section 17-2-202 now provides, in pertinent part:
(a) Each State Trial Court Judge has an affirmative duty to interchange if:
(1) A judge has died or is unable to hold court;
(2) Two (2) or more judges have agreed to a mutually convenient interchange;
(3) The judge is incompetent under the provisions of § 17-2-101; or
(4) The Chief Justice of the Supreme Court has assigned by order a judge to another court pursuant to Rule 11 of the Supreme Court.

Act of June 13, 1997, Pub. Ch. 430, H.B. No. 116 (to be codified at Tenn. Code Ann. 17-2-201; Tenn. Code Ann. 17-2-202).

[11]Grounds of incompetency are:
(1) Where the judge or chancellor is interested in the event of any cause;
(2) Connected with either party, by affinity or consanguinity, within the sixth degree, computing by the civil law;
(3) Has been of counsel in the cause;
(4) Has presided on the trial in an inferior court; or
(5) In criminal cases for felony, where the person upon whom, or upon whose property, the felony has been committed, is connected with the judge or chancellor by affinity or consanguinity within the sixth degree, computing by the civil law.

Tenn. Code Ann. § 17-2-101 (1994).

9

interchange provision between chancellors and circuit judges, he contends, is found within Tenn. Code Ann. §17-2-203. Thus, he argues, chancellors may interchange with circuit judges only when the circuit judge is "incompetent to try any cause pending." Accordingly, because the record fails to establish grounds evidencing Judge Riley's incompetency, the chancellor was without authority to hear this case. The State responds that the appellant's strict interpretation of Tenn. Code Ann. § 17-2-203 is too narrow and against legislative intent. We agree.

Although we do not ignore the plain language of Section 203, after review of Sections 201 *et seq.* and other relevant statutory provisions, we are constrained to conclude that the legislature intended to place such limitations on interchange between chancellors and circuit judges. Several reasons support our conclusion. First, we again reiterate the appellant's position, *i.e.*, chancellors may only interchange with circuit or criminal court judges if the circuit or criminal court judge is deemed incompetent. However, if this limited reading is given to Section 203, not only would chancellors be precluded from interchanging with circuit judges, they would also necessarily be precluded from interchanging with other chancellors, except for reasons of incompetency. Clearly, this was not the intent of our legislature in creating interchange provisions. Moreover, we note that, as indicated by its caption, Section 202 governs only those situations where a judge is incompetent to hear a pending matter, thereby imposing a mandatory duty of interchange.

In interpreting Section 203, our primary role is to ascertain and give effect to the legislative intent without unduly restricting or expanding the statute's coverage beyond its intended scope. Roseman v. Roseman, 890 S.W.2d 27, 29 (Tenn. 1994) (citations omitted). Thus, although the plain language of the statute is generally conclusive, in those circumstances in which a literal

10

application of the statute would produce a result which is demonstrably at odds with the intention of its drafters, the legislative intent will prevail over the literal language of the statute.  See Business Brokerage Centre v. Dixon, 874 S.W.2d 1, 5-6 (Tenn. 1994).  If the legislative intent is unclear from the face of the questioned statute, those statutes relating to the same subject matter, or *in pari materia*, must be construed together, the language of some provisions aiding the interpretation of the other, and viewing the statutes, as a whole, consistent with their legislative purpose.  State v. Blouvett, 904 S.W.2d 111, 113 (Tenn. 1995).

In 1984, the General Assembly reorganized the entire trial court structure in Tennessee.  In doing so, the legislature provided:

> Each trial court judge shall continue to be officially known and designated as either a chancellor, circuit court judge, criminal court judge, or law and equity court judge depending upon the position to which . . . elected or appointed . . . .  Any judge or chancellor may exercise by interchange, appointment, or designation the jurisdiction of any trial court other than that to which such judge or chancellor was elected or appointed.

Tenn. Code Ann. 16-2-502 (1994) (emphasis added).  This section reiterated the proposition that judges and chancellors are officers for the state at large, and not merely for their own circuits or divisions.[12]  See Tenn. Code Ann. 17-1-203 (1994); Lieberman v. Knight, 153 Tenn. 268, 283 S.W. 450 (1925).  However, this reorganization of the court system in no way "alter[ed], diminish[ed] or abolish[ed] . . . the constitutional and historical distinctions between chancery court and circuit court." Tenn. Code Ann. § 16-2-501(b) (1994); Flowers v. Dyer County, 830 S.W.2d 51 (Tenn. 1992) (holding that the general assembly did not

---

[12]Tenn. Code Ann. 17-1-203 provides, in part:
The judges and chancellors are . . . judges and chancellors for the state at large, and as such, may, upon interchange and upon other lawful ground, exercise the duties of office in any other judicial district in the state.
(Emphasis added).

Tenn. Code Ann. 17-1-204(1994) provides, in part:
(a) The judges and chancellors shall have interchangeable and concurrent jurisdiction to grant injunctions, attachments, and all other extraordinary process, issuable out of , and returnable to, any of the circuit or chancery courts of this state.
(Emphasis added).

intend to give the chancery court of Dyer County unbridled discretion to hear cases involving unliquidated damages). In other words, while trial courts are normally restricted to hearing cases over which their respective court has original and exclusive jurisdiction, a trial judge or chancellor, upon reasons enumerated in § 17-2-201, *et seq.*, may interchange with any other trial judge or chancellor within the state, and thereby, acquire jurisdiction to hear the pending case. See also Tenn. Code Ann. § 17-2-206 (1994) ("the judge or chancellor holding court in the circuit or division of another, shall have the same power and jurisdiction as the judge or chancellor in whose place the judge or chancellor is acting"); Harris v. State, No. 03A01-9401-CV-00016 (Tenn. App. at Knoxville, Aug. 3, 1994) (holding that chancellors may interchange with circuit and criminal court judges) (citing Tenn. Code Ann. § 16-2-502; Tenn. Code Ann. 17-2-201 *et seq.*; Dupuis v. Hand, 814 S.W.2d 340 (Tenn. 1991): Elms v. State, 29 Tenn. 128 (1849)).

Next, Sections 17-2-201 and 17-2-205 permit interchange by circuit court judges and criminal court judges "with each other and with judges of all other courts . . . when causes exist making an interchange necessary or desirable, or mutually convenient by agreement." (emphasis added). See also State v. Coolidge, 915 S.W.2d 820, 824 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995) (judges may interchange for personal convenience). But see Tenn. Code Ann. 17-2-202 (imposing a duty upon trial judges to interchange when a trial judge is incompetent). Since circuit and criminal court judges may interchange for mutual convenience, it is only logical to assume that our legislature likewise intended that chancellors, who are also trial judges, may likewise interchange for mutual convenience. To interpret otherwise would negate the intent of the General Assembly in promulgating provisions for interchange and encouraging the same in order to conserve judicial resources. See Act of June 13, 1997, Pub. Ch. 430, H.B. No. 116 (to be codified at Tenn. Code Ann. 17-2-201; Tenn. Code Ann. 17-2-202). Accordingly, we conclude that

12

Chancellor Stafford properly presided by interchange over the appellant's trial. This issue is without merit.

### III. Juror Misconduct

The appellant raises two issues relating to alleged juror misconduct. First, he contends that juror Anthony Alexander's undisclosed prior acquaintance with defense witness, Charles Preston Turner, was prejudicial. Second, he asserts that the jury foreperson, Judy Owen, improperly influenced the jury with extraneous prejudicial information.

### A. Juror Anthony Alexander

The appellant argues that juror Anthony Alexander failed to disclose that he knew one of the defense witnesses and that failure to disclose this fact resulted in prejudice. During *voir dire*, the prospective jurors were specifically asked if any of them knew the two defendants, the victim, or any of the intended witnesses, including Charles Preston Turner. No affirmative response was entered when the inquiry as to Charles Preston Turner was made.

At the motion for new trial, Charles Preston Turner testified that, after he was seated in the witness chair, he recognized Juror Alexander.[13] However, he did not inform defense counsel until after the trial. Turner explained that Alexander had dated his stepsister three to four years ago. Turner's father and stepmother divorced and, subsequently, Turner began dating his former stepsister. Juror Alexander learned of this relationship and ceased association with Turner and his ex-stepsister. As a result of this incident, Turner stated that

---

[13]The appellant, the witness Charles Preston Turner, and the co-defendant, John Turner, are cousins.

he believed Alexander "held a grudge against [him]." Turner further testified that, although he had mentioned the names of both defendants in conversing with Alexander, to his knowledge, Alexander had never met either the appellant or John Turner. Alexander was not called to testify at the hearing.

Article I, Section IX of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1995) (quoting Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). Thus, the function of voir dire is essential. Voir dire permits questioning by the court and counsel in order to lead respective counsel to the intelligent exercise of challenges. Id. (citing 47 Am.Jur.2d, *Jury* §195 (1969)). "Since full knowledge of facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make 'full and truthful answers . . . neither falsely stating any fact nor concealing any material matter.'" Id. at 354-355 (citing 47 Am.Jur.2d, *Jury* § 208 (1969)).

In Tennessee, challenges to juror disqualifications fall within two distinct categories, *propter defectum*, "on account of defect", and *propter affectum*, "for or on account of some affection or prejudice."[14] See Akins, 867 S.W.2d at 355; BLACK'S LAW DICTIONARY 1220 (6th ed. 1990). But see Akins, 867 S.W.2d at 355, note 10. *Propter defectum* challenges must be made prior to the verdict, but *propter affectum* challenges may be made after the verdict. Id. (citing State v. Furlough, 797 S.W.2d 631, 652 (Tenn. Crim. App. 1990)). Thus, when a juror

---

[14]Bouvier mentions as causes for challenge, "*Propter defectum* (on account of some defect) from personal objections, as alienage, infancy, lack of statutory requirements; *propter affectum* (on account of partiality), from some bias or partiality either actually shown to exist or presumed to exist from circumstances." 1 Bouv. Law Dict., Rawle's Third Revision, page 451. Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945).

14

conceals or misrepresents information tending to indicate a lack of impartiality, a challenge may properly be made, in a motion for new trial. Id.

"When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." Id. (citing Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945)). The presumption of bias, however, may be dispelled by an absence of actual favor or partiality by the juror. State v. Taylor, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). Moreover, the defendant bears the burden of providing a prima facie case of bias or partiality. Id. (citing Taylor, 669 S.W.2d at 700).

In the instant case, Charles Preston Turner was the only witness offered to establish Juror Alexander's prior association with Turner and his ex-stepsister. The defense failed to call Juror Alexander to respond to Turner's allegations. While Turner's allegations bring reasonable question to Juror Alexander's partiality, the defense failed to prove the veracity of these allegations, and, as stated by the trial court, "failed to show any bias or partiality on the part of the juror. To the contrary, the uncontroverted proof reveals that the juror did not know the defendant." Findings of fact made by the trial court are given the weight of a jury verdict. State v. Burgin, 668 S.W.2d 668 (Tenn. Crim. App. 1984). We are not at liberty to reverse the trial court's finding unless the evidence clearly preponderates against the trial court's conclusion that the juror was not biased or partial. As the appellant has failed to carry his burden of proof, we defer to the trial court's findings. This issue is without merit.

**B. Jury Foreperson Judy Owen**

Next, the appellant contends that extraneous information was brought into the jury's deliberations by Judy Owen, the jury foreperson, which prejudiced the

15

outcome of the trial. The incident preceding this allegation arose after the jury had retired for deliberation. Judy Owen forwarded a note to the court which read, "We, the jury, would like to hear Ms. Brenda Noel's testimony regarding the seat being broken in the car and Mr. Marvin Robinson's testimony regarding the interior of the car." The court properly informed the jury that "[t]he jury has been provided with all the trial exhibits that have been introduced into evidence. The jury has requested that certain portions of testimony be read to it. The law does not allow this to be done." The jury then retired to continue their deliberations.

At the hearing on the motion for new trial, Juror Michael Price testified that he and the rest of the jurors were "shocked" at the trial court's refusal of this request. He related that, in response to the court's refusal, the jury foreperson said that:

> she had been on trials before and that they should have been . . .
> accessed. There was a woman to my left that said the same thing,
> that she'd been on a jury several times before. They had never
> been denied nothing like that before. The jury fore[person] then
> popped up and said, 'It must have been Mr. Byrd that stopped us
> from having that evidence presented.'

Another juror agreed with the foreperson's observation. Price admitted that these statements had "a big impact" on jury deliberations, in fact, the jury returned its guilty verdicts only two or three minutes later. As a result of Foreperson Owen's statement, Price sought legal advice as to this matter. In finding this issue to be without merit, the trial court found that Juror Price had been allowed to testify in violation of Tenn.R.Evid. 606(b).

> Rule 606(b) provides:
>
> Upon an inquiry into the validity of a verdict or indictment, a juror
> may not testify as to any matter or statement occurring during the
> course of the jury's deliberations or to the effect of anything upon
> any juror's mind or emotion as influencing that juror to assent to or
> dissent from the verdict or indictment or concerning the juror's
> mental processes, except that a juror may testify on the question
> whether extraneous prejudicial information was improperly brought
> to the jury's attention, whether any outside influence was
> improperly brought to bear upon any juror, or whether the jurors

16

agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

(Emphasis added). The public policy consideration behind Rule 606(b) are obvious. These considerations include the prevention of jury harassment, encouragement of free and open jury deliberation, promotion of finality of verdicts and the reduction of the incentive for jury tampering. The right to impeach a jury verdict is extremely limited.

"Extraneous information" is information from a source <u>outside</u> the jury. <u>Caldararo v. Vanderbilt University</u>, 794 S.W.2d 738, 742 (Tenn. App. 1990) (citing <u>State v. Coker</u>, 746 S.W.2d 167, 171 (Tenn. 1987)) (emphasis added). "External influences which could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case." <u>Id</u>. (citation omitted). "Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors; (2) intimidation or harassment of one juror by another; (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions." <u>Id</u>. (citations omitted).

Juror Owen's statements during deliberations were clearly remarks about her prior experience and her opinion relating to the trial court's ruling. Although a prejudicial influence on a jury may be in the form of fact or opinion, the prejudicial fact or opinion <u>must</u> be from contact with a third person. <u>State v. Blackwell</u>, 664 S.W.2d 686, 688-689 (Tenn. 1984). There was no contact with a third person in the instant case. Although the trial court allowed Juror Price to testify, this testimony was precluded by Rule 606(b). This testimony cannot be considered by the court. As such, we defer to the findings of the trial court and

17

find this issue to be without merit.

## IV.  Sufficiency of the Evidence

In his final issue, the appellant questions the sufficiency of the evidence in sustaining his convictions for both aggravated kidnapping and aggravated rape. The appellant contends that the overwhelming inconsistencies in the proof, specifically within the victim's testimony, in addition to the "uncontroverted, unimpeached alibi testimony which was offered on his behalf," "overwhelmingly excludes the defendant from being the perpetrator of the crime[s] for which he was convicted."  Although we acknowledge the discrepancies between the State's proof and the appellant's proof at trial, we disagree with the appellant's contention and resulting conclusion.

Although neither the appellant nor his co-defendant testified at trial, numerous alibi witnesses were presented in defense.  Several of the witnesses providing alibi testified as to the appellant's whereabouts well after the crime had been committed.  Moreover, the record reflects that those witnesses providing the earlier time frame alibi were either cousins of the appellant or close friends.[15] However, the victim positively identified the appellant and the co-defendant as

_____

[15]The State, in its motion for notice of alibi, averred that the offense was alleged to have occurred "between approximately 11:00 p.m. on November 1, 1994 and 12:04 a.m. on November 2, 1994."  Consistent with the victim's adamant reiterations that she was uncertain as to the time of the offense, the proof at trial indicated that the crime could have occurred anywhere between 9:00 p.m. and 12:00 a.m.  Although not argued by the appellant on appeal, a variance existed between the motion and the proof.  However, a variance in a criminal case is only fatal where it is material and prejudicial to the defendant.  State v. Richardson, 875 S.W.2d 671 (Tenn. Crim. App. 1993).  A variance between the proof and the pleadings is not material where the variance is not of a character which would have misled a defendant at the trial.  State v. Turnbill, 640 S.W.2d 40, 48 (Tenn. Crim. App. 1982) (citations omitted).  The appellant, in the present case, makes no assertion that he was in any way prejudiced by the State's proof regarding the time of the offenses.  Moreover, the appellant presented an alibi defense which encompassed a time span between 9:00 p.m. and 12:45 a.m.  We cannot conclude that the variance between the State's motion and the proof at trial in anyway impaired the appellant's defense or constitutional guarantees to a fair trial.

her two perpetrators from a photo line-up and she gave a description of the vehicle, which matched that of the appellant's car. Additionally, the jury was required to resolve the conflict between the State's proof, which placed the appellant in Newbern, Dyer County, at 12:30 a.m., and the defense proof which placed the appellant in Ridgely, Lake County, at the same time.

The determination of the weight and credibility of the testimony of witnesses and reconciliation of conflicts in that testimony are matters entrusted exclusively to the trier of fact, and not this court. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978). Like any other fact at trial, an alibi defense presents an issue of fact determinable by the jury. Cole v. State, 215 S.W.2d 824 (Tenn. 1949); Smith v. State, 566 S.W.2d 553, 556 (Tenn. Crim. App. 1978). Likewise, the credibility of eyewitness testimony identifying the accused as the perpetrator of the criminal offense for which he stands trial is a question of fact for the determination of the jury upon consideration of all competent proof. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)); see also State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Despite the numerous conflicts within the proof at trial, as the arbiters of the credibility of the witnesses, the jury chose to accredit the testimony of the State's witnesses and reject the claims of the appellant. The appellant has had his day in court. This court may not reevaluate the evidence or substitute its inferences for those drawn by the trier of fact from the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A conviction may only be set aside when the reviewing court finds that the evidence is insufficient to support the finding of the trier of fact. Tenn. R. App. P. 13(e).

When there is a challenge to the verdict based upon the sufficiency of the evidence, this court must review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e). A guilty verdict accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. Grace, 493 S.W.2d at 476. Guilt may be predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Moreover, the appellant bears the burden of proving that the evidence is insufficient to support the jury verdict in his case. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1992).

In the light most favorable to the State, the proof at trial revealed that, on November 1, 1994, between 8:30 p.m. and 9:30 p.m., Barbara Noel was walking home after leaving her boyfriend's residence. After several attempts at hitchhiking, she was eventually given a ride by the appellant and John Turner. However, instead of driving Ms. Noel home as promised, the appellant drove to a secluded area, despite Ms. Noel's pleas to be released. During the drive, she was threatened with physical harm. The appellant got into the backseat of the car with the victim, ordered Turner out of the car, and then, with force, sexually penetrated Ms. Noel. See Tenn. Code Ann. § 39-13-503. Ms. Noel testified that the appellant used a blue condom which he had obtained from her purse. After the appellant raped Ms. Noel, he exited the car and began discussing plans to further harm her. The victim was then driven to another location, where she was released.

Aggravated kidnapping is "false imprisonment . . . committed (1) to

20

facilitate the commission of any felony or flight thereafter." Tenn. Code Ann. § 39-13-304 (1990). The evidence presented at trial established that the appellant knowingly removed and confined the victim by transporting her to a secluded area in order to commit the crime of rape. After the rape was successfully completed, the appellant drove the victim to another location where she was ultimately released. We conclude that the evidence is sufficient beyond a reasonable doubt to support a conviction for aggravated kidnapping.

The State sought to enhance the offense of rape through proof that the appellant was aided or abetted by co-defendant Turner. See Tenn. Code Ann. § 39-13-502(3)(A) (1992 Supp.).[16] As we have previously determined that the elements of rape have been proven, the only question under our sufficiency analysis is whether the facts establish that the appellant's commission of the rape was aided or abetted by co-defendant Turner.

In this regard, we note that, at the joint trial, the jury found co-defendant Turner guilty of aggravated rape in that he aided or attempted to aid the appellant in the commission of the rape. However, at the hearing on Turner's motion for new trial, the trial court, finding the evidence insufficient, entered a judgment of acquittal as to Turner's conviction for aggravated rape.[17] Notwithstanding the trial court's ruling that Turner's conduct of aiding and abetting was legally insufficient to support his conviction for aggravated rape, this ruling does not preclude our review as to whether the appellant was "aided or abetted" by Turner, thereby permitting enhancement of the appellant's conviction from rape to that of aggravated rape. Accordingly, we return to the sufficiency

---

[16]Aggravated rape is the "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . (3) The defendant was aided or abetted by one or more other persons; and (A) force or coercion was used to accomplish the act." Tenn. Code Ann. 39-13-502.

[17]The trial court's order recites the thirteenth juror rule as its authority for entry of the judgment of acquittal. The thirteenth juror rule, Tenn. R. Crim. P. 33(f), extends only to the weight of the evidence and if granted results only in a new trial. It is distinguished from Rule 29(c), which governs the sufficiency of the evidence and if granted, results in a judgment of acquittal.

analysis.

The proof establishes that John Turner was present and in a position to aid and assist his co-defendant at all times during the commission of the rape. In addition to his presence, his actions consisted of the following: After the victim entered the appellant's vehicle, the co-defendant Turner began questioning the victim about the kind of sex she had with her boyfriend. Moreover, the victim testified that, after she had been raped, she overheard the appellant and Turner discussing her fate. Specifically, the victim testified that Turner announced, "I'll just shoot the cow."

More than mere presence at the crime scene and an acquaintanceship with the perpetrator is necessary to support a finding that a person is an aider and abettor. Essary v. State, 357 S.W.2d 342 (Tenn. 1962); see also People v. Rockwell, 470 N.W.2d 673 (Mich. App. 1991); State v. Brumley, No. 89-P-2092 (Ohio App. 11 dist. Mar. 29, 1996). Moreover, mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting. But, presence alone is enough if presence is intended to assist the perpetrator in the commission of the offense. See 1 F.Wharton, Criminal Law § 114 at 60 (1978).

For Turner to aid or abet the appellant, it was unnecessary that he share the criminal intent of the perpetrator to commit the rape. However, he must have knowingly intended to assist, encourage, or facilitate the design of the criminal actor. Thus, there must be some evidence tending to show that the alleged aider and abettor, by word or deed, gave active encouragement to the perpetrator of the rape or, by his conduct, made it known to such perpetrator that he was standing by to lend assistance when and if it should become necessary. See Flippen v. State, 365 S.W.2d 895 (Tenn. 1963); see also State v. Penland,

22

472 S.E.2d 734, 743 (N.C. 1996), <u>cert. denied</u>, -- U.S. --, 117 S.Ct. 781 (1997). The aider must, therefore, in some way "associate himself with the venture, participate in it as in something that he wishes to bring about, and seek by his actions to make it succeed." <u>United States v. Peoni</u>, 100 F.2d 401, 402 (2d Cir. 1938), *quoted with approval in,* <u>Nye & Nissan v. United States</u>, 336 U.S. 613, 619, 69 S.Ct. 766, 770 (1949). Thus, although his intent to assist the perpetrator may be proven by circumstantial evidence and need not be demonstrated by express actions, the evidence must support the conclusion that the aider's presence lent support and encouragement to his companion(s).

Whether or not a person present at the scene of the crime aided and abetted the perpetrator of the offense is a question of fact to be determined by the jury. The answer of which depends on circumstances surrounding his presence and his conduct before, during, and after the commission of the rape. In the instant case, we conclude that John Turner's instigation of the victim's sexual preferences before the rape, his presence at the crime scene, and his threat of harm afterward encouraged the appellant's commission of the offense. Moreover, we find that Turner's presence created, in the mind of the victim, an atmosphere of intimidation and a greater threat of harm. Accordingly, we conclude that the evidence is sufficient for a rational trier of fact to find the appellant guilty beyond a reasonable doubt. This issue is without merit.

**V. Conclusion**

After a review of the issues presented by the appellant and the applicable

law, we conclude that there are no errors of law requiring a reversal of the trial court's judgment.  Accordingly, the judgment of convictions finding the appellant guilty of aggravated rape and aggravated kidnapping are affirmed.


_____
DAVID G. HAYES, Judge



CONCUR:



_____
JOSEPH M. TIPTON, Judge



_____
WILLIAM M. BARKER, Judge